OPINION OF THE COURT
Joseph J. Maltese, J.
In a medical malpractice action, the jury awarded the plaintiffs, a severely brain damaged child and his parents, a verdict of $53,735,955. The defendant doctor and hospital have petitioned this court, pursuant to CPLR 4545 (a), to reduce the amount of that award by applying collateral sources to pay for the future cost of medical care and therapies (rehabilitative services) to be received by the child. The defendants seek to apply the mother’s employee health insurance plan and the benefits received while the child is in school pursuant to the Federal Individuals with Disabilities Education Act (IDEA) to offset the financial burden placed upon the defendants by the large jury award. They also seek to have the plaintiffs enroll in a managed health care plan (HMO) where the defendants would pay the premiums.
Facts
The jury found Dr. Michael Monaco, the obstetrician, 50% liable, Staten Island University Hospital, 40% liable, and Dr. *746 Jose Luis Rementeria, a neonatalogist who was an employee of the hospital, 10% liable. The jury found that Dr. Henry Sasso, the anesthesiologist, and Seaview Medical Group, of which he was a member, were not liable.
The jury made the following awards of damages:
Pain and Suffering to the present $ 5,000,000
Future Pain and Suffering for 45 years $12,500,000
Medical Care and Equipment $ 1,863,743 for 45 years
Therapies $ 2,167,671 for 45 years
Nursing Care $28,731,591 for 45 years
Loss of Earnings $ 3,472,950 for 43 years
Total Economic Loss $36,235,955
Total Damages $53,735,955
This court determines that the defendants are entitled to a 25.6% reduction of the award for lost earnings for income taxes pursuant to CPLR 4546. Accordingly, the award for future lost total earnings in the sum of $3,472,950 is reduced to $2,583,875. Therefore, the final judgment award is $52,846,880. Since Dr. Monaco, who settled during trial for $3,000,000, was found 50% liable, pursuant to General Obligations Law § 15-108, the remaining defendants, Dr. Jose Luis Rementeria and Staten Island University Hospital (hereinafter collectively referred to as defendants), are liable for 50% of the total judgment award or $26,423,440.
Collateral Sources
At common law, a defendant was not entitled to any offset or reduction of a jury’s verdict based upon collateral sources which the plaintiff may receive (Bryant v New York City Health & Hosps. Corp., 93 NY2d 592 [1999]; Oden v Chemung County Indus. Dev. Agency, 87 NY2d 81, 85-86 [1995]). This was altered by statute (CPLR 4545), which allows collateral sources evidence to be presented and taken into consideration by the court in reducing damages. The statute provides that: “In any action for medical, dental or podiatric malpractice where the plaintiff seeks to recover for the cost of medical care, dental care, podiatric care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source such as insurance (except for life insur *747 anee), social security (except those benefits provided under title XVIII of the social security act), workers’ compensation or employee benefit programs (except such collateral sources entitled by law to liens against any recovery of the plaintiff). If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding, minus an amount equal to the premiums paid by the plaintiff for such benefits for the two-year period immediately preceding the accrual of such action and minus an amount equal to the projected future cost to the plaintiff of maintaining such benefits. In order to find that any future cost or expense will, with reasonable certainty, be replaced or indemnified by the collateral source, the court must find that the plaintiff is legally entitled to the continued receipt of such collateral source, pursuant to a contract or otherwise enforceable agreement, subject only to the continued payment of a premium and such other financial obligations as may be required by such agreement.” (CPLR 4545 [a] [emphasis added].)
The burden of proof with respect to a collateral source offset is on the defendants (Caruso v LeFrois Bldrs., 217 AD2d 256, 259 [4th Dept 1995]; see also, Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C4545:3, at 349). There may only be a reduction for “those collateral source payments that duplicate or correspond to a particular item of economic loss” (Oden v Chemung County Indus. Dev. Agency, 87 NY2d, supra, at 88). In order to obtain an offset from a collateral source, the defendants must prove by clear and convincing proof that it is reasonably certain, which has been interpreted to mean “highly probable,” that the benefits will be received. (Caruso v LeFrois Bldrs., 217 AD2d, at 259; cited with approval in Manfredi v Preston, 246 AD2d 580 [2d Dept 1998].) Since CPLR 4545 is in derogation of the common law, it must be strictly construed (Oden v Chemung County Indus. Dev. Agency, 87 NY2d, at 85-86). It should further be noted that “CPLR 4545 was intended to eliminate double recoveries, not provide defendants and their insurers with an ‘undeserved windfall.’ ” (Bryant v New York City Health & Hosps. Corp., 93 NY2d, supra, at 607.)
A. Mother’s Insurance Policies
The infant plaintiff’s medical and nursing care has thus far been paid for in large part by health insurance coverage provided to his mother, Donna Giventer, through her employ *748 ment with the Union Beach Board of Education.[1] Mrs. Giventer’s health insurance benefits will only be received if she continues in her current employment and her employer continues to provide the insurance. There can be no assurances that the insurance will continue to benefit her son, Evan. If Mrs. Giventer lost her job or the employer or insurance company changed the benefits, those factors would be beyond her control.
Moreover, by reducing Evan’s award based upon insurance his mother has through her job would force Mrs. Giventer to continue at her current employment without regard to her personal and professional goals and desires and irrespective of what is best for her and the rest of her family. Mrs. Giventer has a right to change jobs or stop working altogether. No one can force her to have to work. Treating her employee health insurance as a collateral source would require her to work in order to provide her son with the care which he requires which a jury has already found the defendants are obligated to provide.
Accordingly, since Mrs. Giventer cannot be forced to work, the reasonable certainty standard of CPLR 4545 cannot be satisfied by the insurance benefits which are received through her employment and are not a collateral source offset.
B. The Infant Plaintiff Should Purchase His Own Insurance or Join an HMO.
The defendants also suggest that the infant plaintiff can purchase his own health insurance in order to provide them with a collateral source offset. Mr. Pessalano, the defendant’s rehabilitation expert who testified at the collateral source hearing, stated that Evan Giventer could purchase insurance through Blue Cross of New Jersey for $3,000 to $3,500 per year, which after a one-year waiting period would pay out literally hundreds of thousands of dollars per year for Evan’s extensive nursing care. However, when cross-examined on this point, Mr. Pessalano’s testimony was vague and speculative. He responded that: “[i]t would pay for a significant amount” but that he could not say how much without seeing a policy. When asked if he could provide a copy of such a plan, he responded that he did not have one.
The defendants also suggest that Evan be required to become a member of a managed health care plan, an HMO. Evan cur *749 rently lives at home with his family. It was never proven to this court that any insurance company would approve home nursing care as opposed to care in a residential institution. No one testified as to what level of care an insurance company would permit. The jury’s awards will permit Evan and his parents to obtain the care that they choose, from doctors and nurses of their choice, without any limitations such as preapproval or being on a list for treatment or any other constraints which accompany managed care. An HMO would not replace what the jury awarded and cannot give rise to a collateral source offset. Nor can the infant plaintiff or his guardians be required to join an HMO which may or may not accept Evan and his preexisting condition.
Accordingly, insurance which the plaintiffs do not have can never be reasonably certain to replace what the jury awarded and cannot be considered a collateral source offset.
C. The IDEA — School Provided Benefits
In seeking an offset, the defendants point to the “right to special education and related services for children” as mandated by the Federal IDEA (20 USC § 1400 [c]). The purpose of IDEA is to “provide for the education of all children with disabilities,” and “to assess, and assure the effectiveness of, efforts to educate children with disabilities.” (20 USC § 1400 [d] [1] [C]; [4].) IDEA specifically provides that the Federal funds “shall be used to pay only the excess costs directly attributable to the education of handicapped children” (20 USC former § 1414 [a] [2] [B] [i]). In upholding a disabled student’s right to a full-time nurse while he is in school, the United States Supreme Court observed in Cedar Rapids Community School Dist. v. Garret F. (526 US 66, 79 [1999]), that “[t]his case is about whether meaningful access to the public schools will be assured.” The physical health and well being of the child were not factors that were considered, only his educational opportunity. The nursing services were only to be provided while the child was in school and the Supreme Court found that they “must be provided if [he] is to remain in school.” (Supra, at 79.)
The New Jersey law which governs and guides the IDEA program “require[s] that all school-age children be assured the fullest possible opportunity to develop their intellectual capacities.” (NJ Stat Annot § 18A:46-19.1.) This corresponds with the New York law, which sets forth as the criteria “the educational progress and achievement of the child with a handicapping condition and the child’s ability to participate in instructional *750 programs in regular education” (Education Law § 4402 [1] [b] [2]).
What is actually provided to a child is dependent upon a child study team, which consults with the Board of Education. (NJ Stat Annot § 18A:46-5.) “A dispute sometimes arises about the acceptability of the entire program and placement recommended for the student. Parents are then entitled to request an administrative hearing regarding the referral, classification, evaluation, program or placement of the child [NJ Stat Annot § 6:28-2.7]. This proceeding is known as a ‘due process hearing.’ Prior to requesting such a hearing, either the parent or the board may, with the consent of both parties, request a trained mediator from the state Department of Education, Division of Special Education to conduct a mediation conference. Participation in the mediation is not a prerequisite to a hearing, however [NJ Stat Annot § 6:28-2.6].” (Simon and Rosenberg, The Substantive and Procedural Aspects of Special Education Litigation, 154 NJ Law 31, 33 [July 1993].)
An Administrative Judge will then make a binding decision over the hearing and his or her ruling must be implemented immediately. (See, NJ Admin Code §§ 1:1-18.1, 6:24-1.1 et seq.) The Judge’s ruling is based on whether the proposed plan is “suitably tailored to provide [the child] with a free appropriate education which * * * result[s] in [the child] benefitting educationally from the plan.” (M.K. v Summit Bd. of Educ., 91 NJ Admin 2d 33 [1991].) As a result, parents’ suggestions could be disregarded if it is concluded that the child is receiving an appropriate education.
Discussion
The jury in this case made no awards for special education and related services. Therefore, whatever the school may provide in that regard is irrelevant and does not directly correspond with an item of loss awarded by the jury. Nor is there any correlation between the jury’s award for nursing care and the nursing services Evan may receive in school. While Evan receives some nursing care while in school, it was never shown that he receives “medical services” or care through the school.
In fact, the IDEA, upon which the defendants rely, provides only services necessary for the child’s education and excludes medical services other than those necessary for diagnosis and evaluation (see, 20 USC former § 1401 [a] [17]; see also, Cedar Rapids Community School Dist. v Garret F., 526 US 66 [1999], supra). While the defendants seek an offset for nursing care *751 Evan may receive while in school, the jury made no award for nursing care while Evan is in school.[2]
Furthermore, the projections of the plaintiffs’ expert economist excluded nursing care while Evan is in school. Since the jury again awarded precisely what was projected, there is no doubt that the jury’s award did not include nursing care while Evan is in school. As such, there can be no offset for nursing care while Evan is in school. The evidence presented by the plaintiff was specifically for private therapies at home. Again, the jury awarded precisely what the testimony called for, the jury’s award clearly contemplated private therapies at home and cannot then be replaced by school therapies which are not equivalent in nature.
In light of all of the considerations set forth above, the trial courts of this State have repeatedly rejected claims by defendants that services available through the school may qualify as a collateral source. In Andrialis v Snyder (159 Misc 2d 419 [Sup Ct, NY County 1993]), the court expressly held that school-supplied therapies and counseling should not provide for a reduction under CPLR 4545. The plaintiff in that case received awards for speech, physical and occupational therapy for 13 years and psychotherapy for 15 years. The defendants sought a reduction under CPLR 4545, claiming that this therapy could be provided at school and in support of that claim submitted the testimony of Paul Ivers, an employee of the New York City Board of Education. In rejecting the defendants’ claim, the court found as follows: “Mr. Ivers testified that the infant plaintiff’s entitlement to these therapies would be ‘based on a clinical assessment of the child’, that it would be necessary that the infant plaintiff be ‘found to need the services by a committee of Special Education’, that he would be entitled to benefits only ‘if he has been found to have a learning disability’ (an issue vigorously disputed by defendants at trial, one of defendants’ expert witnesses testifying that it was more probable than not that the infant plaintiff would graduate from college), that it had to be determined that ‘he needs that therapy to maintain him in the program’, that *752 the entitlement of infant plaintiff to therapy, the amount of the therapy, and its duration would depend on a report prepared by a clinician who would ‘review the child and submit a report’ and ‘on the clinical information presented to a committee’. Further, the parents could not select the therapist. The infant plaintiff would be treated only by those practitioners approved by the Board of Education and the State Education Department who would be paid a contractual rate arrived at by competitive bidding. The testimony offered concerning the bureaucratic approvals necessary to obtain treatment, and the limited choice of practitioners willing to accept the State contractual rate of payment sufficiently dilutes the reasonable certainty requirement. I do not find, therefore, with reasonable certainty that the therapies the jury concluded the infant plaintiff needs will be replaced by the so-called collateral sources discussed by Mr. Ivers in his testimony. No deduction will be made, therefore, from the reduced awards for therapies.” (Supra, at 428-429.)
The same court had earlier rejected the same claim in Ursini v Sussman (143 Misc 2d 727, 728-729 [Sup Ct, NY County 1993]). The court held that (at 728-729): “[f|or the court to find ‘with reasonable certainty * * *’ that a future cost or expense will be replaced in all or in part it must determine that ‘plaintiff is legally entitled to the continued receipt of such collateral source, pursuant to a contract or otherwise enforceable agreement’. No proof of the existence of such contract or agreement was received.” Similarly, in Delaney v Misericordia Hosp. (Sup Ct, Bronx County, Part 16, index No. 16596/86), a medical malpractice action stemming from injuries sustained by an infant plaintiff during delivery, Justice Lottie E. Wilkins rejected the defendant’s argument that services provided in the schools may be used to reduce the jury’s award for therapies under CPLR 4545. Justice Wilkins held that the: “[p]laintiffs concerns about proposed budget cuts in funding for special education-related services are warranted. However, the Court need not consider that circumstance since Dr. Ehrenreich’s testimony, by itself, sufficiently dilutes the reasonable certainty requirement. Especially, when consideration is given to his testimony concerning the prior discontinuance of in school therapeutic services to the infant-plaintiff, together with the periodic bureaucratic approvals and reviews necessary to obtain and continue such treatments, and, not least, that the choice of practitioners for the supply of such therapeutic services is restricted by the limits of the state contractual rate of *753 payment. Therefore, based upon the foregoing, I do not find with reasonable certainty that the therapies which the jury concluded that the infant plaintiff will need, will be replaced by any so-called collateral sources which have been presented by Dr. Ehrenreich in his testimony.” (Slip opn, at 3-4.)
The same argument was rejected in Depradine v New York City Health & Hosps. Corp. (Sup Ct, Kings County, index No. 95741/85, affd 255 AD2d 288 [2d Dept 1998], affd 93 NY2d 592 [1999]). In rejecting the defendant’s argument that school services under the IDEA may be treated as a collateral source, Justice William T. Bellard found that purported governmental entitlements fail to state with reasonable certainty the cost or amount of therapy expenses to be available in the future warranting a reduction. The court further held that “there is no showing given the state of the economy, the actual amount now available or funds to be available in the future.” (Depradine v New York City Health & Hosps. Corp., slip opn, at 3.)
In Royal v Booth Mem. Hosp. (Sup Ct, Queens County, index No. 11718/89), Justice Joseph F. Lisa likewise rejected the defendants’ claim that services supplied through the school under the IDEA constitute a collateral source. Among the factors noted by the court in rejecting the defendants’ claim was that “Dr. Ehrenreich’s testimony in regard to the bureaucratic approvals necessary to obtain and continue appropriate and necessary service defeats defendants’ proof as to the reasonable certainty standard.” (Supra, slip opn, at 4.) With regard to the persons who render those services, the court noted that they are “not subject to parental choice or approval” and they are limited to those willing to accept a rate of pay approved by the Board of Education. (Supra, slip opn, at 5.) The court further found that even if it otherwise found that the reasonable certainty requirement was satisfied, it would find that the school services do not replace the jury’s award for private therapies. The court explained: “However, even if the court might be persuaded to accept the benefits provided by IDEA as a collateral source to offset the cost of therapies before the age of 21, the trial evidence presented in this case militates against such result. The plaintiff’s expert’s unrebutted testimony at trial was that the plaintiff needed physical, occupational and speech therapies in addition to those provided in the school setting. Apparently the jury accepted this testimony and made an award on that basis. Thus, defendants have also failed to establish that the benefits provided by IDEA replace [ ] a particular category of economic loss, i.e. additional therapies, for which the jury made an award.” (Supra, slip opn, at 5-6.)
*754 The courts have repeatedly held that a plaintiff need not be relegated to charitable or governmental aid and assistance where he has received a jury award for specific items. This was the specific holding of the First Department in Germosen v Gupta (237 AD2d 121 [1st Dept 1997]). In Skinner v New York City Health & Hosps. Corp. (NYLJ, Nov. 29, 1989, at 22, col 4 [Sup Ct, NY County]), Judge Sklar in upholding a $7.39 million verdict held that services rendered by charitable organizations such as United Cerebral Palsy may not be used to reduce the jury’s verdict. In other States it has also been held likewise. In Hall v Birchfield (718 SW2d 313, 338 [Tex 1986], revd on other grounds 747 SW2d 361 [Tex 1987]) it was held that “[t]here is no guarantee the government will continue to provide such services, and [the infant plaintiff! is entitled to exercise her option to obtain other services than those offered by the government.” In Feeley v United States (337 F2d 924, 935 [3d Cir 1964]), the Third Circuit held that “[t]o force a plaintiff to chose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice.” Thus, Evan cannot be relegated to relying upon school supplied therapies in order to reduce the defendants’ liability.
Conclusion
This court holds that the defendants have not proven to this court that any such cost or expense that was awarded by the jury “was or will, with reasonable certainty, be replaced or indemnified from any collateral source.” Accordingly, this court will not reduce the amount of the award beyond the reduction for income taxes and in compliance with General Obligations Law § 15-108.
Accordingly, a judgment for $26,423,440 will be entered against Staten Island University Hospital and Dr. Jose Luis Rementeria.

. Horizon Blue Cross Blue Shield of New Jersey has paid $78,442.48 in 1999 (up till Aug. 1, 1999); $203,165.67 in 1998; $233,840.39 in 1997; and $30,499.07 in 1996.

. Based upon the testimony of Dr. Leon Charash and Mrs. Giventer, plaintiffs’ economist projected the cost for 16 shifts a week of nursing care until Evan reaches age 21 to come to the total undiscounted sum of $1,741,559. Sixteen shifts is two shifts per day during the week while Evan is in school and three shifts per day on the weekends when he is not in school. By projecting only 16 shifts a week until age 21, the plaintiffs have not sought any award for nursing care while Evan is in school.