OPINION OF THE COURT
Robert L. Estes, J.
By petition dated April 1, 2002, Joseph Beck, superintendent *94 of the Stamford Central School District (hereinafter the district), commenced this proceeding seeking to have respondent, Robert T. Doe (Bobby), who was then eight years of age (date of birth Aug. 18, 1993), adjudicated a person in need of supervision (PINS).
The petition, filed two months after the child had been removed from Stamford Central School by his parents, alleges that between September 5, 2001 and February 1, 2002, Bobby had been tardy to school on 23 occasions, absent without legal excuse on four occasions, and had on October 11, 2001, slapped one teacher, hit another, and threatened a third. The petition also alleges that Bobby was spitting at other students and a teacher during recess on November 29, 2001 and, in general during the 2001-2002 school year, was a “serious disruption.”
Fact-finding was held on July 26, 2002 and July 30, 2002. At the close of the petitioner’s evidence on the second day, Bobby’s Law Guardian moved to dismiss the petition in the furtherance of justice on the ground that the district should have modified Bobby’s individualized education program (IEP) before filing a PINS petition. The court reserved decision on the Law Guardian’s motion, and fact-finding was completed with presentation of the respondent’s evidence. The attorneys have since submitted posthearing memoranda.
In September 2001, Bobby was enrolled in second grade at the district. He remained a student of the district until on or about February 5, 2002, when his mother removed him and enrolled him elsewhere. The proof adduced at fact-finding established that Bobby had been previously classified in preschool as “speech-impaired.” The district Committee on Special Education (CSE) had continued this classification, i.e., Bobby is a child identified as having a disability under the Individuals with Disabilities Education Act (IDEA). The instant petition does not mention Bobby’s status as a disabled student.
Petitioner established that Bobby was absent without a legal excuse on four days, i.e., December 11, 2001, December 21, 2001, January 4, 2002, and January 18, 2002. However, in each instance, the district’s own exhibit 1 clearly states that the school nurse was unable to obtain a note from the parent. On the first three dates, Bobby offered his candid explanation of why he had been absent, i.e., he had been traveling, shopping, vacationing with his parents. This eight-year-old boy did not absent himself from school of his own volition; but, rather, *95 he had been with his parents at their behest. Arguably, these absences might sustain a charge of educational neglect, but they do not constitute proof beyond a reasonable doubt of the behaviors defined at Family Court Act § 712 (a) as required by Family Court Act § 744 (b).
As to the “tardy to school” charge, the testimony of the district food service manager and records of the district’s own before-school breakfast program show unequivocally that Bobby was in school between 7:45-8:10 a.m. for breakfast on some 16 of the 23 occasions, he was alleged to have been tardy to school. Bobby’s other occasions of tardiness ranged from a few minutes to up to an hour late for school. The school nurse testified that although Bobby was supposed to ride the bus to school, on those occasions when he was tardy, he was driven to school by his parents. In fact, the school nurse had personally observed Bobby being tardy to school on at least one day when he was driven by his parents. Bobby’s mother testified that his parents drove him to school when he was tardy. Again, this tardiness, coupled with the absences, might arguably support a charge of educational neglect against Bobby’s parents, but it does not constitute proof beyond a reasonable doubt of the behaviors defined at Family Court Act § 712 (a) as required by Family Court Act § 744 (b).
On October 11, 2002, Bobby was removed from recess by Ms. Chastaine, his regular education teacher, and put in a comer for being “uncooperative.” He burped, made throat noises, pushed a chair, yelled, made spitting noises, made faces, stuck his tongue out, crawled away from her, and, when she ignored him, slapped Ms. Chastaine on the arm. Bobby then refused to walk with two teachers to the office. He crawled and was dragged along on his knees by them. Ms. McKenna, Bobby’s special education teacher, was one of the two teachers. She testified that Bobby “sort of slapped me on the hand.” Ms. McKenna had taught Bobby for three years, but had not before seen such behavior from him. At the office, Ms. Mable, the chair of the Committee on Special Education, described Bobby as making flatulent noises with his mouth and laughing. Bobby threatened to hit and kick her. She characterized this as “defiant, uncontrollable behavior.”
On November 29, 2001, Bobby made spitting sounds during recess. He did not actually make saliva land on anyone. There was no saliva on his chin.
It is also charged that Bobby continued to be “a serious disruption” during the 2001-2002 school year. Gregory Sanik, *96 district assistant superintendent and K-7 principal, described Bobby’s behavior as “bizarre,” e.g., Bobby would not respond to his questions, but would make guttural noises, a kind of burping with throat sounds. Bobby would make faces, giving a “Bronx Cheer.” Sanik testified that Bobby chewed on a sneaker and did not stop when asked. Bobby passed gas and asked “How do you like that one?”
The school safety officer, Paul Stoddart, was assigned as “disciplinarian” for Bobby. Stoddart checked on Bobby two to three times per week to let Bobby know he was in the school building. There is no evidence in this record that Stoddart has any education or training as a teacher or is qualified by New York State certification to provide instruction to this child. However, at the request of Bobby’s teachers with the approval of thfe district administrators, Stoddart would enter the classroom and sit next to Bobby, ostensibly to keep him focused and on task. Stoddart would accompany Bobby to the lunch room. Bobby’s parents cooperated with Stoddart to the extent that he had the mother’s home and cell phone numbers and would call her to report on Bobby’s behavior. Stoddart also reported any behavioral incidents to Mr. Sanik, the elementary principal.
Stoddart was unaware that Bobby was a child with a disability. He candidly admitted in his testimony that he didn’t know what Bobby’s disabilities were, but realized something was wrong, observing that one day Bobby could be the nicest young man you’d want to be around, i.e., polite, manners, friendly, hugs, and the next day, he could be the angriest, young boy you could think of seeing, showing fits of rage. Stod-dart reported his own concerns about Bobby’s behavior, e.g., stating that he “seemed like two different children” to Ms. Mable about six times, because he knew she was CSE chair.
The Law Guardian points out that the district filed this PINS petition two months after Bobby had been removed from attendance upon instruction at the district by his parents, after the district had failed to review his IEP in the 2001-2002 school year.
While the provisions of article 7 of the enactment do not provide a statutory ground for the Law Guardian’s motion to dismiss on such a ground, it is within the inherent authority of the court to dismiss “in the interests of justice.” Authority for dismissal on this ground is also implied under article 7 since the Legislature provided for such a basis for dismissal when it addressed the much more serious conduct of juvenile delin *97 quents under the provisions of Family Court Act § 315.2 (Matter of Ruffel P., 153 Misc 2d 702, 704 [Fam Ct, NY County 1992]).
Whether a change in a student’s educational placement has occurred, for purposes of triggering protections of IDEA, must be determined on a case-by-case basis, after considering whether the educational program set out in the child’s IEP has been revised, whether the child will be able to be educated with nondisabled children to the same extent, whether the child will have the same opportunities to participate in nonacademic and extracurricular services, and whether the new placement option is the same option on the continuum of alternative placements. (Individuals with Disabilities Education Act § 601 et seq. [Pub L 91-230, tit VI, 84 US Stat 175, as amended by Pub L 105-17, 111 US Stat 37], now 20 USC § 1400 et seq.; Matter of Beau II, 95 NY2d 234 [2000].)
Congress enacted IDEA “to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs.” (20 USC § 1400 [d] [1] [A]; see also Cedar Rapids Community School Dist. v Garret F. ex rel. Charlene F., 526 US 66, 68 [1999] [discussing the purposes of IDEA].) To this end, IDEA requires that public schools create for each student covered by the act an IEP for each year of the student’s education. (20 USC § 1414 [d] [2] [A] ; see also Honig v Doe, 484 US 305, 311 [1988] [defining the IEP as the “centerpiece” of IDEA’S education delivery system].)
An appropriate program begins with an IEP which accurately reflects the results of evaluations to identify the child’s needs, provides for the use of appropriate special education services to address the child’s special education needs, and establishes annual goals and short-term instructional objectives which are related to the child’s educational deficits (Application of Child with Disability, appeal No. 93-9; Application of Child with Disability, appeal No. 93-12).
The IDEA statute clearly requires, at 20 USC § 1414 (d) (3) (B) (i), “The IEP team shall * * * in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior.” The results of a student’s individual evaluation information, including the functional behavioral assessment, are reviewed at a CSE meeting.
Children with disabilities who begin to demonstrate a new pattern of behavior which may result in behavior problems *98 leading to suspensions should cause the school to initiate an IEP meeting to assist in determining if additional interventions or modifications in the IEP are needed to change that pattern of negative behavior. Such interventions may reduce the chances of the child accumulating a series of suspensions which may, over time, constitute an inappropriate “change in placement.” (Kevin P. Dwyer, NCSP, Disciplining Students With Disabilities, <http://www.ldonline.org/ld_indepth/ special_education/nasp_discipline.html> [last visited Jan. 28, 2002].) Ms. McKenna, who had taught Bobby for three years, testified that Bobby’s bad behavior on October 11, 2002 was new for him.
By its own admission, as set forth in the pleadings and proof, the district has merely used different discipline techniques on Bobby. He was removed from recess. He was placed in a corner. He was sent to the office, to the chair of the CSE. He was sent to the principal. He has had multiple referrals for discipline, as meticulously recorded by the district’s paperwork. Bobby, an eight-year-old boy, has had a school safety officer assigned to him as a “disciplinarian” to accompany him to class and to lunch. At no time before the filing of the within petition does it appear that the district ever dealt with Bobby’s problems from something other than a disciplinary approach. At no time did the district try a different teaching approach.
However, it is clear that the addition of the school safety officer as “disciplinarian” to accompany Bobby was a revision made to his educational program without the benefit of an IEP meeting by the CSE. Now, the district petitions the court for supervision or treatment of Bobby. In the context of what has gone before, there can be no doubt that the district is proposing another modification that is likely to affect Bobby’s learning experience in some significant way. (Individuals with Disabilities Education Act § 601 et seq., 20 USC § 1400 et seq.)
Bobby’s mother testified that on some six or seven occasions she orally requested that a CSE meeting be held for Bobby, but the district refused to do so. Bobby’s mother testified that the Delaware County Department of Social Services, with the cooperation of the district, had urged her to surrender Bobby to them for foster care. Bobby’s mother had no behavior problems with Bobby at home. After the first day of this PINS proceeding, she observed him crying and acting scared and upset emotionally.
The district seeks to change Bobby’s placement by filing this PINS petition. The district seeks to remove him from his *99 educational program, making it likely that he will not be able to be educated with nondisabled children to the same extent or have the same opportunities to participate in nonacademic and extracurricular services. The new placement option of supervision and treatment is definitely more restrictive on the continuum of alternative placements than Bobby’s current IEP, especially if a foster care placement is sought.
As a result of a PINS adjudication here, a substantial and material change would be worked upon Bobby’s educational placement. He would not attend the same school, the same classes, or receive the same school services to address his disability as before the PINS proceeding. This court finds that, in this specific case, there truly is a contemplated change in Bobby’s educational placement; therefore, there is a need to follow IDEA procedures. The district specifically seeks a more restrictive placement for Bobby, instead of trying to retain him in his current program.
Based on all of the foregoing, this court dismisses the instant proceeding in the interest of justice. It is the opinion of this court that it is appropriate for a school district to first attempt to fashion, from its many resources, a reasonable and appropriate environment for a child before commencing judicial proceedings. The court finds that it would be most unjust to adjudicate this young boy as a PINS and subject him to probable destructive placements until after the district has at least attempted, in good faith, to engage the problem. (See Matter of Ruffel P., supra at 707.) Accordingly, the motion to dismiss is granted in the interest of justice, and it is so ordered.
If the court had not determined to grant the motion to dismiss, the petition would nevertheless be denied on the merits, on the ground that the petitioner has failed to prove beyond a reasonable doubt that the respondent has not attended school in accordance with the provisions of part I of article 65 of the Education Law or that he is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent or other person legally responsible for his care as required by Family Court Act § 712 (a).