# CEDAR RAPIDS COMMUNITY SCHOOL DISTRICT *v.* GARRET F., A MINOR, BY HIS MOTHER AND NEXT FRIEND, CHARLENE F.

No. 96–1793.   Argued November 4, 1998—Decided March 3, 1999

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which KENNEDY, J., joined, *post*, p. 79.

*Sue Luettjohann Seitz* argued the cause for petitioners. With her on the briefs was *Edward M. Mansfield.*

*Douglas R. Oelschlaeger* argued the cause for respondents. With him on the brief was *Diane Kutzko.*

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the

brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, David K. Flynn,* and *Seth M. Galanter.**

JUSTICE STEVENS delivered the opinion of the Court.

The Individuals with Disabilities Education Act (IDEA), 84 Stat. 175, as amended, was enacted, in part, "to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U. S. C. § 1400(c). Consistent with this purpose, the IDEA authorizes federal financial assistance to States that agree to provide disabled children with special education and "related services." See §§ 1401(a)(18), 1412(1). The question presented in this case is whether the definition of "related services" in § 1401(a)(17)[1] requires a public school

---

*Gwendolyn H. Gregory* and *Julie Underwood* filed a brief for the National School Boards Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Academy of Pediatrics et al. by *Paul M. Smith* and *Nory Miller;* and for the National Association of Protection and Advocacy Systems et al. by *Leslie Seid Margolis.*

[1] "The term 'related services' means transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children." 20 U. S. C. § 1401(a)(17).

Originally, the statute was enacted without a definition of "related services." See Education of the Handicapped Act, 84 Stat. 175. In 1975, Congress added the definition at issue in this case. Education for All Handicapped Children Act of 1975, § 4(a)(4), 89 Stat. 775. Aside from nonsubstantive changes and added examples of included services, see, *e. g.,* Individuals with Disabilities Education Act Amendments of 1997, § 101, 111 Stat. 45; Individuals with Disabilities Education Act Amendments of 1991, § 25(a)(1)(B), 105 Stat. 605; Education of the Handicapped Act

district in a participating State to provide a ventilator-dependent student with certain nursing services during school hours.

I

Respondent Garret F. is a friendly, creative, and intelligent young man. When Garret was four years old, his spinal column was severed in a motorcycle accident. Though paralyzed from the neck down, his mental capacities were unaffected. He is able to speak, to control his motorized wheelchair through use of a puff and suck straw, and to operate a computer with a device that responds to head movements. Garret is currently a student in the Cedar Rapids Community School District (District), he attends regular classes in a typical school program, and his academic performance has been a success. Garret is, however, ventilator dependent,[2] and therefore requires a responsible individual nearby to attend to certain physical needs while he is in school.[3]

---

Amendments of 1990, § 101(c), 104 Stat. 1103, the relevant language in § 1401(a)(17) has not been amended since 1975. All references to the IDEA herein are to the 1994 version as codified in Title 20 of the United States Code—the version of the statute in effect when this dispute arose.

[2] In his report in this case, the Administrative Law Judge explained: "Being ventilator dependent means that [Garret] breathes only with external aids, usually an electric ventilator, and occasionally by someone else's manual pumping of an air bag attached to his tracheotomy tube when the ventilator is being maintained. This later procedure is called ambu bagging." App. to Pet. for Cert. 19a.

[3] "He needs assistance with urinary bladder catheterization once a day, the suctioning of his tracheotomy tube as needed, but at least once every six hours, with food and drink at lunchtime, in getting into a reclining position for five minutes of each hour, and ambu bagging occasionally as needed when the ventilator is checked for proper functioning. He also needs assistance from someone familiar with his ventilator in the event there is a malfunction or electrical problem, and someone who can perform emergency procedures in the event he experiences autonomic hyperreflexia. Autonomic hyperreflexia is an uncontrolled visceral reaction to anxiety or a full bladder. Blood pressure increases, heart rate increases,

During Garret's early years at school his family provided for his physical care during the schoolday. When he was in kindergarten, his 18-year-old aunt attended him; in the next four years, his family used settlement proceeds they received after the accident, their insurance, and other resources to employ a licensed practical nurse. In 1993, Garret's mother requested the District to accept financial responsibility for the health care services that Garret requires during the schoolday. The District denied the request, believing that it was not legally obligated to provide continuous one-on-one nursing services.

Relying on both the IDEA and Iowa law, Garret's mother requested a hearing before the Iowa Department of Education. An Administrative Law Judge (ALJ) received extensive evidence concerning Garret's special needs, the District's treatment of other disabled students, and the assistance provided to other ventilator-dependent children in other parts of the country. In his 47-page report, the ALJ found that the District has about 17,500 students, of whom approximately 2,200 need some form of special education or special services. Although Garret is the only ventilator-dependent student in the District, most of the health care services that he needs are already provided for some other students.[4] "The primary difference between Garret's situation and that of other students is his dependency on his ventilator for life support." App. to Pet. for Cert. 28a. The ALJ noted that the parties disagreed over the training or

_____

and flushing and sweating may occur. Garret has not experienced autonomic hyperreflexia frequently in recent years, and it has usually been alleviated by catheterization. He has not ever experienced autonomic hyperreflexia at school. Garret is capable of communicating his needs orally or in another fashion so long as he has not been rendered unable to do so by an extended lack of oxygen." *Id.*, at 20a.

[4] "Included are such services as care for students who need urinary catheterization, food and drink, oxygen supplement positioning, and suctioning." *Id.*, at 28a; see also *id.*, at 53a.

licensure required for the care and supervision of such students, and that those providing such care in other parts of the country ranged from nonlicensed personnel to registered nurses. However, the District did not contend that only a licensed physician could provide the services in question.

The ALJ explained that federal law requires that children with a variety of health impairments be provided with "special education and related services" when their disabilities adversely affect their academic performance, and that such children should be educated to the maximum extent appropriate with children who are not disabled. In addition, the ALJ explained that applicable federal regulations distinguish between "school health services," which are provided by a "qualified school nurse or other qualified person," and "medical services," which are provided by a licensed physician. See 34 CFR §§ 300.16(a), (b)(4), (b)(11) (1998). The District must provide the former, but need not provide the latter (except, of course, those "medical services" that are for diagnostic or evaluation purposes, 20 U. S. C. § 1401(a)(17)). According to the ALJ, the distinction in the regulations does not just depend on "the title of the person providing the service"; instead, the "medical services" exclusion is limited to services that are "in the special training, knowledge, and judgment of a physician to carry out." App. to Pet. for Cert. 51a. The ALJ thus concluded that the IDEA required the District to bear financial responsibility for all of the services in dispute, including continuous nursing services.[5]

---

[5] In addition, the ALJ's opinion contains a thorough discussion of "other tests and criteria" pressed by the District, id., at 52a, including the burden on the District and the cost of providing assistance to Garret. Although the ALJ found no legal authority for establishing a cost-based test for determining what related services are required by the statute, he went on to reject the District's arguments on the merits. See id., at 42a–53a. We do not reach the issue here, but the ALJ also found that Garret's in-school needs must be met by the District under an Iowa statute as well as the IDEA. Id., at 54a–55a.

The District challenged the ALJ's decision in Federal District Court, but that court approved the ALJ's IDEA ruling and granted summary judgment against the District. *Id.,* at 9a, 15a. The Court of Appeals affirmed. 106 F. 3d 822 (CA8 1997). It noted that, as a recipient of federal funds under the IDEA, Iowa has a statutory duty to provide all disabled children a "free appropriate public education," which includes "related services." See *id.,* at 824. The Court of Appeals read our opinion in *Irving Independent School Dist.* v. *Tatro,* 468 U. S. 883 (1984), to provide a two-step analysis of the "related services" definition in § 1401(a)(17)—asking first, whether the requested services are included within the phrase "supportive services"; and second, whether the services are excluded as "medical services." 106 F. 3d, at 824–825. The Court of Appeals succinctly answered both questions in Garret's favor. The court found the first step plainly satisfied, since Garret cannot attend school unless the requested services are available during the schoolday. *Id.,* at 825. As to the second step, the court reasoned that *Tatro* "established a bright-line test: the services of a physician (other than for diagnostic and evaluation purposes) are subject to the medical services exclusion, but services that can be provided in the school setting by a nurse or qualified layperson are not." 106 F. 3d, at 825.

In its petition for certiorari, the District challenged only the second step of the Court of Appeals' analysis. The District pointed out that some federal courts have not asked whether the requested health services must be delivered by a physician, but instead have applied a multifactor test that considers, generally speaking, the nature and extent of the services at issue. See, *e. g., Neely* v. *Rutherford County School,* 68 F. 3d 965, 972–973 (CA6 1995), cert. denied, 517 U. S. 1134 (1996); *Detsel* v. *Board of Ed. of Auburn Enlarged City School Dist.,* 820 F. 2d 587, 588 (CA2) *(per curiam),* cert. denied, 484 U. S. 981 (1987). We granted the District's petition to resolve this conflict. 523 U. S. 1117 (1998).

## II

The District contends that § 1401(a)(17) does not require it to provide Garret with "continuous one-on-one nursing services" during the schoolday, even though Garret cannot remain in school without such care. Brief for Petitioner 10. However, the IDEA's definition of "related services," our decision in *Irving Independent School Dist.* v. *Tatro*, 468 U. S. 883 (1984), and the overall statutory scheme all support the decision of the Court of Appeals.

The text of the "related services" definition, see n. 1, *supra*, broadly encompasses those supportive services that "may be required to assist a child with a disability to benefit from special education." As we have already noted, the District does not challenge the Court of Appeals' conclusion that the in-school services at issue are within the covered category of "supportive services." As a general matter, services that enable a disabled child to remain in school during the day provide the student with "the meaningful access to education that Congress envisioned." *Tatro*, 468 U. S., at 891 (" 'Congress sought primarily to make public education available to handicapped children' and 'to make such access meaningful' " (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176, 192 (1982))).

This general definition of "related services" is illuminated by a parenthetical phrase listing examples of particular services that are included within the statute's coverage. § 1401(a)(17). "[M]edical services" are enumerated in this list, but such services are limited to those that are "for diagnostic and evaluation purposes." *Ibid.* The statute does not contain a more specific definition of the "medical services" that are excepted from the coverage of § 1401(a)(17).

The scope of the "medical services" exclusion is not a matter of first impression in this Court. In *Tatro* we concluded that the Secretary of Education had reasonably determined that the term "medical services" referred only to services

that must be performed by a physician, and not to school health services. 468 U. S., at 892–894. Accordingly, we held that a specific form of health care (clean intermittent catheterization) that is often, though not always, performed by a nurse is not an excluded medical service. We referenced the likely cost of the services and the competence of school staff as justifications for drawing a line between physician and other services, *ibid.*, but our endorsement of that line was unmistakable.[6] It is thus settled that the phrase

---

[6] "The regulations define 'related services' for handicapped children to include 'school health services,' 34 CFR §300.13(a) (1983), which are defined in turn as 'services provided by a qualified school nurse or other qualified person,' §300.13(b)(10). 'Medical services' are defined as 'services provided by a licensed physician.' §300.13(b)(4). Thus, the Secretary has [reasonably] determined that the services of a school nurse otherwise qualifying as a 'related service' are not subject to exclusion as a 'medical service,' but that the services of a physician are excludable as such.

. . . . .

". . . By limiting the 'medical services' exclusion to the services of a physician or hospital, both far more expensive, the Secretary has given a permissible construction to the provision." 468 U. S., at 892–893 (emphasis added) (footnote omitted); see also *id.*, at 894 ("[T]he regulations state that school nursing services must be provided only if they can be performed by a nurse or other qualified person, not if they must be performed by a physician").

Based on certain policy letters issued by the Department of Education, it seems that the Secretary's post-*Tatro* view of the statute has not been entirely clear. *E. g.*, App. to Pet. for Cert. 64a. We may assume that the Secretary has authority under the IDEA to adopt regulations that define the "medical services" exclusion by more explicitly taking into account the nature and extent of the requested services; and the Secretary surely has the authority to enumerate the services that are, and are not, fairly included within the scope of §1407(a)(17). But the Secretary has done neither; and, in this Court, he advocates affirming the judgment of the Court of Appeals. Brief for United States as *Amicus Curiae* 7–8, 30; see also *Auer* v. *Robbins*, 519 U. S. 452, 462 (1997) (an agency's views as *amicus curiae* may be entitled to deference). We obviously have no authority to rewrite the regulations, and we see no sufficient reason to revise *Tatro*, either.

"medical services" in § 1401(a)(17) does not embrace all forms of care that might loosely be described as "medical" in other contexts, such as a claim for an income tax deduction. See 26 U. S. C. § 213(d)(1) (1994 ed. and Supp. II) (defining "medical care").

The District does not ask us to define the term so broadly. Indeed, the District does not argue that any of the items of care that Garret needs, considered individually, could be excluded from the scope of 20 U. S. C. § 1401(a)(17).[7] It could not make such an argument, considering that one of the services Garret needs (catheterization) was at issue in *Tatro*, and the others may be provided competently by a school nurse or other trained personnel. See App. to Pet. for Cert. 15a, 52a. As the ALJ concluded, most of the requested services are already provided by the District to other students, and the in-school care necessitated by Garret's ventilator dependency does not demand the training, knowledge, and judgment of a licensed physician. *Id.*, at 51a–52a. While more extensive, the in-school services Garret needs are no more "medical" than was the care sought in *Tatro*.

Instead, the District points to the combined and continuous character of the required care, and proposes a test under which the outcome in any particular case would "depend upon a series of factors, such as [1] whether the care is continuous or intermittent, [2] whether existing school health personnel can provide the service, [3] the cost of the service, and [4] the potential consequences if the service is not properly performed." Brief for Petitioner 11; see also *id.*, at 34–35.

The District's multifactor test is not supported by any recognized source of legal authority. The proposed factors can be found in neither the text of the statute nor the regulations that we upheld in *Tatro*. Moreover, the District offers no explanation why these characteristics make one service

---

[7] See Tr. of Oral Arg. 4–5, 12.

any more "medical" than another. The continuous character of certain services associated with Garret's ventilator dependency has no apparent relationship to "medical" services, much less a relationship of equivalence. Continuous services may be more costly and may require additional school personnel, but they are not thereby more "medical." Whatever its imperfections, a rule that limits the medical services exemption to physician services is unquestionably a reasonable and generally workable interpretation of the statute. Absent an elaboration of the statutory terms plainly more convincing than that which we reviewed in *Tatro*, there is no good reason to depart from settled law.[8]

Finally, the District raises broader concerns about the financial burden that it must bear to provide the services that Garret needs to stay in school. The problem for the District in providing these services is not that its staff cannot be trained to deliver them; the problem, the District contends, is that the existing school health staff cannot meet all of their

---

[8] At oral argument, the District suggested that we first consider the nature of the requested service (either "medical" or not); then, if the service is "medical," apply the multifactor test to determine whether the service is an excluded physician service or an included school nursing service under the Secretary of Education's regulations. See Tr. of Oral Arg. 7, 13–14. Not only does this approach provide no additional guidance for identifying "medical" services, it is also disconnected from both the statutory text and the regulations we upheld in *Irving Independent School Dist.* v. *Tatro*, 468 U. S. 883 (1984). "Medical" services are generally *excluded* from the statute, and the regulations elaborate on that statutory term. No authority cited by the District requires an additional inquiry if the requested service is both "related" and non-"medical." Even if § 1401(a)(17) demanded an additional step, the factors proposed by the District are hardly more useful in identifying "nursing" services than they are in identifying "medical" services; and the District cannot limit educational access simply by pointing to the limitations of existing staff. As we noted in *Tatro*, the IDEA requires schools to hire specially trained personnel to meet disabled student needs. *Id.*, at 893.

responsibilities and provide for Garret at the same time.[9] Through its multifactor test, the District seeks to establish a kind of undue-burden exemption primarily based on the cost of the requested services. The first two factors can be seen as examples of cost-based distinctions: Intermittent care is often less expensive than continuous care, and the use of existing personnel is cheaper than hiring additional employees. The third factor—the cost of the service— would then encompass the first two. The relevance of the fourth factor is likewise related to cost because extra care may be necessary if potential consequences are especially serious.

The District may have legitimate financial concerns, but our role in this dispute is to interpret existing law. Defining "related services" in a manner that *accommodates* the cost concerns Congress may have had, cf. *Tatro*, 468 U. S., at 892, is altogether different from using cost *itself* as the definition. Given that § 1401(a)(17) does not employ cost in its definition of "related services" or excluded "medical services," accepting the District's cost-based standard as the sole test for determining the scope of the provision would require us to engage in judicial lawmaking without any guidance from Congress. It would also create some tension with the purposes of the IDEA. The statute may not require public schools to maximize the potential of disabled students com-

---

[9] See Tr. of Oral Arg. 4–5, 13; Brief for Petitioner 6–7, 9. The District, however, will not necessarily need to hire an additional employee to meet Garret's needs. The District already employs a one-on-one teacher associate (TA) who assists Garret during the schoolday. See App. to Pet. for Cert. 26a–27a. At one time, Garret's TA was a licensed practical nurse (LPN). In light of the state Board of Nursing's recent ruling that the District's registered nurses may decide to delegate Garret's care to an LPN, see Brief for United States as *Amicus Curiae* 9–10 (filed Apr. 22, 1998), the dissent's future-cost estimate is speculative. See App. to Pet. for Cert. 28a, 58a–60a (if the District could assign Garret's care to a TA who is also an LPN, there would be "a minimum of additional expense").

mensurate with the opportunities provided to other children, see *Rowley*, 458 U. S., at 200; and the potential financial burdens imposed on participating States may be relevant to arriving at a sensible construction of the IDEA, see *Tatro*, 468 U. S., at 892. But Congress intended "to open the door of public education" to all qualified children and "require[d] participating States to educate handicapped children with nonhandicapped children whenever possible." *Rowley*, 458 U. S., at 192, 202; see *id.*, at 179–181; see also *Honig* v. *Doe*, 484 U. S. 305, 310–311, 324 (1988); §§ 1412(1), (2)(C), (5)(B).[10]

---

[10] The dissent's approach, which seems to be even broader than the District's, is unconvincing. The dissent's rejection of our unanimous decision in *Tatro* comes 15 years too late, see *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989) (*stare decisis* has "special force" in statutory interpretation), and it offers nothing constructive in its place. Aside from rejecting a "provider-specific approach," the dissent cites unrelated statutes and offers a circular definition of "medical services." *Post*, at 81 (opinion of THOMAS, J.) ("'services' that are 'medical' in 'nature'"). Moreover, the dissent's approach apparently would exclude most ordinary school nursing services of the kind routinely provided to nondisabled children; that anomalous result is not easily attributable to congressional intent. See *Tatro*, 468 U. S., at 893.

In a later discussion the dissent does offer a specific proposal: that we now interpret (or rewrite) the Secretary's regulations so that school districts need only provide disabled children with "health-related services that school nurses can perform as part of their normal duties." *Post*, at 85. The District does not dispute that its nurses "can perform" the requested services, so the dissent's objection is that District nurses would not be performing their "normal duties" if they met Garret's needs. That is, the District would need an "additional employee." *Ibid.* This proposal is functionally similar to a proposed regulation—ultimately withdrawn—that would have replaced the "school health services" provision. See 47 Fed. Reg. 33838, 33854 (1982) (the statute and regulations may not be read to affect legal obligations to make available to handicapped children services, including school health services, made available to nonhandicapped children). The dissent's suggestion is unacceptable for several reasons. Most important, such revisions of the regulations are better left to the Secretary, and an additional staffing need is generally not a sufficient objection to the requirements of § 1401(a)(17). See n. 8, *supra*.

This case is about whether meaningful access to the public schools will be assured, not the level of education that a school must finance once access is attained. It is undisputed that the services at issue must be provided if Garret is to remain in school. Under the statute, our precedent, and the purposes of the IDEA, the District must fund such "related services" in order to help guarantee that students like Garret are integrated into the public schools.

The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE THOMAS, with whom JUSTICE KENNEDY joins, dissenting.

The majority, relying heavily on our decision in *Irving Independent School Dist.* v. *Tatro*, 468 U. S. 883 (1984), concludes that the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. § 1400 *et seq.*, requires a public school district to fund continuous, one-on-one nursing care for disabled children. Because *Tatro* cannot be squared with the text of IDEA, the Court should not adhere to it in this case. Even assuming that *Tatro* was correct in the first instance, the majority's extension of it is unwarranted and ignores the constitutionally mandated rules of construction applicable to legislation enacted pursuant to Congress' spending power.

I

As the majority recounts, *ante*, at 68, IDEA authorizes the provision of federal financial assistance to States that agree to provide, *inter alia*, "special education and related services" for disabled children. § 1401(a)(18). In *Tatro, supra,* we held that this provision of IDEA required a school district to provide clean intermittent catheterization to a disabled child several times a day. In so holding, we relied on Department of Education regulations, which we concluded had reasonably interpreted IDEA's definition of "related

services"[1] to require school districts in participating States to provide "school nursing services" (of which we assumed catheterization was a subcategory) but not "services of a physician." *Id.*, at 892–893. This holding is contrary to the plain text of IDEA, and its reliance on the Department of Education's regulations was misplaced.

A

Before we consider whether deference to an agency regulation is appropriate, "we first ask whether Congress has 'directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *National Credit Union Admin.* v. *First Nat. Bank & Trust Co.*, 522 U. S. 479, 499–500 (1998) (quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984)).

Unfortunately, the Court in *Tatro* failed to consider this necessary antecedent question before turning to the Department of Education's regulations implementing IDEA's related services provision. The Court instead began "with the regulations of the Department of Education, which," it said, "are entitled to deference." 468 U. S., at 891–892. The Court need not have looked beyond the text of IDEA, which expressly indicates that school districts are not required to provide medical services, except for diagnostic and evaluation purposes. 20 U. S. C. § 1401(a)(17). The majority asserts that *Tatro* precludes reading the term "medical serv-

---

[1] IDEA currently defines "related services" as "transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, and medical services, *except that such medical services shall be for diagnostic and evaluation purposes only*) as may be required to assist a child with a disability to benefit from special education . . . ." 20 U. S. C. § 1401(a)(17) (emphasis added).

ices" to include "all forms of care that might loosely be described as 'medical.'" *Ante*, at 75. The majority does not explain, however, why "services" that are "medical" in nature are not "medical services." Not only is the definition that the majority rejects consistent with other uses of the term in federal law,[2] it also avoids the anomalous result of holding that the services at issue in *Tatro* (as well as in this case), while not "medical services," would nonetheless qualify as medical care for federal income tax purposes. *Ante*, at 74–75.

The primary problem with *Tatro*, and the majority's reliance on it today, is that the Court focused on the provider of the services rather than the services themselves. We do not typically think that automotive services are limited to those provided by a mechanic, for example. Rather, anything done to repair or service a car, no matter who does the work, is thought to fall into that category. Similarly, the term "food service" is not generally thought to be limited to work performed by a chef. The term "medical" similarly does not support *Tatro*'s provider-specific approach, but encompasses services that are "of, *relating to, or concerned with* physicians *or* with the practice of medicine." See Webster's Third New International Dictionary 1402 (1986) (emphasis added); see also *id.*, at 1551 (defining "nurse" as "a person skilled in caring for and waiting on the infirm, the injured, or the sick; *specif:* one esp. trained to carry out such duties under the supervision of a physician").

---

[2] See, *e. g.*, 38 U. S. C. § 1701(6) ("The term 'medical services' includes, in addition to medical examination, treatment, and rehabilitative services— . . . surgical services, dental services . . . , optometric and podiatric services, . . . preventive health services, . . . [and] such consultation, professional counseling, training, and mental health services as are necessary in connection with the treatment"); § 101(28) ("The term 'nursing home care' means the accommodation of convalescents . . . who require nursing care and related medical services"); 26 U. S. C. § 213(d)(1) ("The term 'medical care' means amounts paid—. . . for the diagnosis, cure, mitigation, treatment, or prevention of disease").

IDEA's structure and purpose reinforce this textual interpretation. Congress enacted IDEA to increase the *educational* opportunities available to disabled children, not to provide medical care for them. See 20 U. S. C. § 1400(c) ("It is the purpose of this chapter to assure that all children with disabilities have . . . a free appropriate public education"); see also § 1412 ("In order to qualify for assistance . . . a State shall demonstrate . . . [that it] has in effect a policy that assures all children with disabilities the right to a free appropriate public education"); *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley,* 458 U. S. 176, 179 (1982) ("The Act represents an ambitious federal effort to promote the education of handicapped children"). As such, where Congress decided to require a supportive service—including speech pathology, occupational therapy, and audiology—that appears "medical" in nature, it took care to do so explicitly. See § 1401(a)(17). Congress specified these services precisely because it recognized that they would otherwise fall under the broad "medical services" exclusion. Indeed, when it crafted the definition of related services, Congress could have, but chose not to, include "nursing services" in this list.

B

*Tatro* was wrongly decided even if the phrase "medical services" was subject to multiple constructions, and therefore, deference to any reasonable Department of Education regulation was appropriate. The Department of Education has never promulgated regulations defining the scope of IDEA's "medical services" exclusion. One year before *Tatro* was decided, the Secretary of Education issued proposed regulations that defined excluded medical services as "services relating to the practice of medicine." 47 Fed. Reg. 33838 (1982). These regulations, which represent the Department's only attempt to define the disputed term, were never adopted. Instead, "[t]he regulations actually define only those 'medical services' that *are* owed to handicapped

children," *Tatro*, 468 U. S., at 892, n. 10 (emphasis in original), not those that *are not*. Now, as when *Tatro* was decided, the regulations require districts to provide services performed "'by a licensed physician to determine a child's medically related handicapping condition which results in the child's need for special education and related services.'" *Ibid.* (quoting 34 CFR §300.13(b)(4) (1983), recodified and amended as 34 CFR §300.16(b)(4) (1998).

Extrapolating from this regulation, the *Tatro* Court presumed that this meant that "'medical services' not owed under the statute are those 'services by a licensed physician' that serve other purposes." *Tatro, supra,* at 892, n. 10 (emphasis deleted). The Court, therefore, did not defer to the regulation itself, but rather relied on an inference drawn from it to speculate about how a regulation might read if the Department of Education promulgated one. Deference in those circumstances is impermissible. We cannot defer to a regulation that does not exist.[3]

## II

Assuming that *Tatro* was correctly decided in the first instance, it does not control the outcome of this case. Because IDEA was enacted pursuant to Congress' spending power, *Rowley, supra,* at 190, n. 11, our analysis of the statute in this case is governed by special rules of construction. We have repeatedly emphasized that, when Congress places conditions on the receipt of federal funds, "it must do so unambiguously." *Pennhurst State School and Hospital* v. *Hal-*

---

[3] Nor do I think that it is appropriate to defer to the Department of Education's litigating position in this case. The agency has had ample opportunity to address this problem but has failed to do so in a formal regulation. Instead, it has maintained conflicting positions about whether the services at issue in this case are required by IDEA. See *ante,* at 74, n. 6. Under these circumstances, we should not assume that the litigating position reflects the "agency's fair and considered judgment." *Auer* v. *Robbins,* 519 U. S. 452, 462 (1997).

*derman,* 451 U. S. 1, 17 (1981). See also *Rowley, supra,* at 190, n. 11; *South Dakota* v. *Dole,* 483 U. S. 203, 207 (1987); *New York* v. *United States,* 505 U. S. 144, 158 (1992). This is because a law that "condition[s] an offer of federal funding on a promise by the recipient . . . amounts essentially to a contract between the Government and the recipient of funds." *Gebser* v. *Lago Vista Independent School Dist.,* 524 U. S. 274, 286 (1998). As such, "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst, supra,* at 17 (citations omitted). It follows that we must interpret Spending Clause legislation narrowly, in order to avoid saddling the States with obligations that they did not anticipate.

The majority's approach in this case turns this Spending Clause presumption on its head. We have held that, in enacting IDEA, Congress wished to require "States to educate handicapped children with nonhandicapped children whenever possible," *Rowley, supra,* at 202. Congress, however, also took steps to limit the fiscal burdens that States must bear in attempting to achieve this laudable goal. These steps include requiring States to provide an education that is only "appropriate" rather than requiring them to maximize the potential of disabled students, see 20 U. S. C. § 1400(c); *Rowley, supra,* at 200, recognizing that integration into the public school environment is not always possible, see § 1412(5), and clarifying that, with a few exceptions, public schools need not provide "medical services" for disabled students, §§ 1401(a)(17) and (18).

For this reason, we have previously recognized that Congress did not intend to "impos[e] upon the States a burden of unspecified proportions and weight" in enacting IDEA. *Rowley, supra,* at 190, n. 11. These federalism concerns require us to interpret IDEA's related services provision, con-

sistent with *Tatro*, as follows: Department of Education regulations require districts to provide disabled children with health-related services that school nurses can perform as part of their normal duties. This reading of *Tatro*, although less broad than the majority's, is equally plausible and certainly more consistent with our obligation to interpret Spending Clause legislation narrowly. Before concluding that the district was required to provide clean intermittent catheterization for Amber Tatro, we observed that school nurses in the district were authorized to perform services that were "difficult to distinguish from the provision of [clean intermittent catheterization] to the handicapped." *Tatro*, 468 U. S., at 893. We concluded that "[i]t would be strange indeed if Congress, in attempting to extend special services to handicapped children, were unwilling to guarantee them services of a kind that are routinely provided to the nonhandicapped." *Id.*, at 893–894.

Unlike clean intermittent catheterization, however, a school nurse cannot provide the services that respondent requires, see *ante*, at 69–70, n. 3, and continue to perform her normal duties. To the contrary, because respondent requires continuous, one-on-one care throughout the entire schoolday, all agree that the district must hire an additional employee to attend solely to respondent. This will cost a minimum of $18,000 per year. Although the majority recognizes this fact, it nonetheless concludes that the "more extensive" nature of the services that respondent needs is irrelevant to the question whether those services fall under the medical services exclusion. *Ante*, at 75. This approach disregards the constitutionally mandated principles of construction applicable to Spending Clause legislation and blindsides unwary States with fiscal obligations that they could not have anticipated.

\* \* \*

For the foregoing reasons, I respectfully dissent.