J.D., by his parent, J.D., Plaintiff—Appellant,

v.

**PAWLET SCHOOL DISTRICT, Bennington–Rutland Supervisory Union, Vermont Department of Education, and Mark Hull, in his official and individual capacity, Defendants—Appellees.**

No. 99–9263.

United States Court of Appeals, Second Circuit.

Argued: June 30, 2000

Decided: Aug. 15, 2000

**62**

Karl C. Anderson, Anderson & Eaton, P.C., Rutland, VT, for Appellant.

Patti R. Page, Stitzel, Page & Fletcher, P.C., Burlington, VT, for Appellees Pawlet School District and Bennington–Rutland Supervisory Union.

Geoffrey A. Yudien, Special Assistant Attorney General, Vermont Department of Education, Montpelier, VT, for Appellees Vermont Department of Education and Commissioner Marc Hull.

Before: LEVAL, PARKER, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

J.D., by his parent J.D., appeals from a final judgment of the United States District Court for the District of Vermont (Jerome J. Niedermeier, *Magistrate Judge*), granting the defendants-appellees' motion for summary judgment dismissing the complaint in its entirety. The district court held that: (1) J.D. failed to meet the "adverse effect" eligibility criterion of the Vermont Department of Education Special Education Regulations ("VSER"), which implement the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.;[1] (2) the defendants-appellees did not discriminate against J.D. in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and (3) J.D. was not entitled to relief based on alleged violations of certain procedural safeguards in the IDEA. We affirm.

## I. BACKGROUND

### A. Factual Background

The following facts are undisputed except where noted. J.D., a minor of high school age at all times relevant to this action, is an academically gifted child who also has emotional and behavioral problems. Defendants Bennington–Rutland Supervisory Union and Pawlet School District (collectively, the "School District") are local educational agencies within the mean-

---

**1.** All references herein to federal statutes and regulations are to the 1996 versions which were in effect when J.D. requested a formal evaluation for special education. All refer-

ences to the Vermont regulations are to the 1994 version which the parties agree apply to this action.

ing of 20 U.S.C. § 1401(a)(8) and receive federal funds. Defendant Vermont Department of Education is a State educational agency within the meaning of 20 U.S.C. § 1401(a)(7) and also receives federal assistance. (The Department and its commissioner, Marc Hull, are collectively referred to as the "State Defendants.")

J.D. attended Pawlet Elementary School through the third grade when he transferred to Poultney Elementary School outside the Pawlet School District for the fourth and fifth grades. Partly because of his academic progress, he skipped the sixth grade and was placed in Poultney High School ("PHS") for the seventh grade, where he was allowed to take ninth grade English. While in the seventh grade, J.D. took an IQ test on which he scored in the top two percent of his age group. In the eighth grade, J.D. took the Comprehensive Test of Basic Skills, a norm-based examination on which he received grade equivalency scores for reading, language, and mathematics that were predominantly in the tenth, eleventh, and twelfth grade levels. Even his lowest score, in spelling, placed him at the mid-eighth grade level. In the ninth grade, he took classes at or above his grade level in a variety of subjects and achieved grades ranging from B to A+.

1. *The IDEA Evaluation*

During the summer of 1996, between J.D.'s ninth and tenth grade years, J.D.'s parents requested that he be evaluated for special education because they were concerned that PHS was not meeting their son's intellectual or emotional needs. In response, the School District convened an Evaluation and Planning Team (the "EPT") to determine J.D.'s eligibility for special education. The EPT considered J.D.'s results on standardized academic achievement tests, his cumulative school file consisting of grades, progress reports, and teacher comments, and a psychological evaluation conducted by Dr. Roger Meisenhelder, a psychologist selected by J.D.'s parents. According to Dr. Meisenhelder, J.D. had "superior" verbal and language skills, together with good concentration and "highly developed" conceptual and abstract thinking skills. These conclusions were largely consistent with J.D.'s academic record from kindergarten through the ninth grade.

However, Dr. Meisenhelder also observed that J.D. experienced "frustration, boredom, alienation, apathy, and hopelessness" because of an absence of intellectual peers at PHS, and that these feelings persisted despite a "somewhat differentiated curriculum at school," leading to passive resistance as well as aggressive behavior at school. Dr. Meisenhelder recommended that J.D. be: (1) classified as a student with an "emotional and behavioral" disability; (2) placed in a school environment in which he has academically challenging courses and intellectual peers; and (3) given individual and family counseling.

Based on Dr. Meisenhelder's report, the EPT concluded that J.D. had an emotional-behavioral disability within the meaning of Rule 2362.1(h) of the VSER, as further explained below. When the EPT members were unable to reach consensus on whether J.D.'s disability adversely affected his educational performance, the School District, pursuant to Rule 2364.1, offered its decision that J.D. did not meet this criterion and notified J.D.'s parents of their right to challenge this decision.

2. *The 504 Evaluation*

Having decided that J.D. was ineligible for special education under the IDEA, the EPT referred his request to an evaluation team (the "504 Team") to determine whether he qualified for protection under § 504 of the Rehabilitation Act, 29 U.S.C. § 794; *see also* 34 C.F.R. § 104.35 (entitled "Evaluation and placement"). In December 1996, the 504 Team informed J.D.'s parents that J.D. was a "qualified individual with a disability" and was eligible for accommodations. On January 10, 1997, the 504 Team offered J.D. a two-part pro-

gram of support which was to include (1) individual counseling, and (2) training in peer relationship skills in the academic setting. In the same letter, the 504 Team stated that another meeting would be held on January 21, 1997 to determine academic accommodations, if any. Rather than await the outcome of that meeting, J.D.'s parents notified the School District on January 15 that they had unilaterally enrolled their son in Simon's Rock College, an out-of-state boarding school for the academically gifted, and requested funding for his tuition and costs.

Notwithstanding the parents' decision, the 504 Team proceeded with the January 21 meeting and subsequently informed J.D.'s parents that the Team considered three placements: at PHS, which J.D. had been attending since the seventh grade; at Troy Academy, an approved independent local secondary school which is affiliated with PHS; and at Simon's Rock College. The School District recommended PHS, noting that it offered courses in advanced placement biology, chemistry, United States history, and Pacesetter mathematics, with additional access to literature and English courses at a nearby college. The Team specifically rejected Simon's Rock because it is a post-secondary institution, explaining, among other things, that the School District had no duty to provide post-secondary education. The School District did not expressly offer or reject Troy Academy.

### 3. *The Proceedings Below*

Not satisfied with the offered program, J.D.'s parents requested an administrative due process hearing on or about March 6, 1997, seeking reimbursement for J.D.'s tuition and costs at Simon's Rock. On April 21, 1997, J.D.'s attorney informed the State hearing officer that J.D. intended to proceed pro se and had authorized him to waive up to that date the regulatory requirement that a decision be issued within 45 days of the receipt of a request for a hearing. The parties dispute as to wheth-

er J.D., by his father or other representative, consented to any further delay after April 21. The State Defendants allege, and J.D. does not dispute, that J.D. asserted a 45-day violation for the first time in a reply brief submitted to the hearing officer on June 16.

On June 18, the hearing officer rendered an oral decision granting partial summary judgment for the School District on the substantive IDEA claim. The oral decision was confirmed by a thorough written opinion dated July 8, 1997, which held that: (1) J.D. was ineligible for special education under the IDEA because he was performing at or above age and grade norms in each of eight basic skill areas; (2) the School District had provided J.D. with a free appropriate public education under § 504 of the Rehabilitation Act and was not further obligated to place him among his intellectual peers outside his residential community; and (3) summary disposition of the complaint was proper and the failure to decide the complaint within 45 days was harmless error. *See In re J.D.*, 26 IDELR 501 (Vt. July 8, 1997) (*"J.D. I"*). Pursuant to 20 U.S.C. § 1415(e)(2), J.D. appealed to the United States District Court for the District of Vermont, which affirmed for substantially the reasons stated in the administrative decision. *See J.D. v. Pawlet Sch. Dist.*, No. 97–CV–290, slip op. (D.Vt. Sept. 17, 1999) (*"J.D. II"*).

## II. *DISCUSSION*

### A. *Standard of Review*

 Whether the district court accurately applied the statutory and regulatory terms in the IDEA and the Vermont implementing regulations to J.D.'s educational and emotional history is a mixed question of law and fact, which we review *de novo*. *See, e.g., Muller v. Committee on Special Educ.*, 145 F.3d 95, 102 (2d Cir. 1998) (reviewing *de novo* IDEA case that required application of statutory and regulatory definitions); *Heather S. v. Wisconsin*, 125 F.3d 1045, 1053 (7th Cir.1997)

(same); *Yankton Sch. Dist. v. Schramm,* 93 F.3d 1369, 1373 (8th Cir.1996) (plenary review of disabled student's eligibility for IDEA services). We also review *de novo* all other issues on which the district court granted summary judgment. *See, e.g., De-Bord v. Board of Educ.,* 126 F.3d 1102, 1104 (8th Cir.1997) (plenary review of summary judgment dismissing § 504 claim); *cf. Stone v. City of Mt. Vernon,* 118 F.3d 92, 99 (2d Cir.1997) (reviewing *de novo* summary judgment dismissing a § 504 claim in the context of alleged employment discrimination).

## B. *The Substantive IDEA Claim*

██ We begin with the substantive IDEA claim because its resolution will facilitate our decision as to the procedural IDEA claim. The substantive claim presents a matter of first impression: whether an academically gifted child with an emotional-behavioral disability is eligible for special education under the IDEA and the corresponding Vermont regulations. We agree with the district court that he is not.

### 1. *The IDEA*

██ The IDEA was enacted, in part, " 'to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.' " *Cedar Rapids Community Sch. Dist. v. Garret F.,* 526 U.S. 66, 68, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) (quoting 20 U.S.C. § 1400(c)); *see Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The instruction must "meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP [individualized education program[2]]." *Rowley,* 458 U.S. at

189, 102 S.Ct. 3034. Recognizing that educational policy and practice are traditional State and local functions, in enacting the IDEA, Congress did not prescribe any substantive standard of education, instead seeking only "to open the door of public education to handicapped children on appropriate terms." *Id.* at 192, 102 S.Ct. 3034; *see Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1044 (5th Cir.1989) (citing *Rowley,* 458 U.S. at 189, 207, 102 S.Ct. 3034). Accordingly, implementation responsibilities are delegated to the State educational service agencies—in this case, the Vermont Department of Education—by means of financial incentives. *See* 20 U.S.C. § 1401(a)(7) (defining "State educational agency") & § 1412 ("Eligibility requirements"). A local educational agency, such as the School District, also qualifies to receive federal funds if it provides a free appropriate public education consistent with the IDEA. *See id.* § 1414(a).

Under the IDEA, the term "children with disabilities" means, among others, children with a "serious emotional disturbance ... who, by reason thereof, *need special education* and related services." *Id.* § 1401(a)(1)(A) (emphasis added); *see* 34 C.F.R. § 300.7(a)(1). The federal regulations promulgated under the statute further define "serious emotional disturbance" as:

a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that *adversely affects a child's educational performance—*

. . . . .

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

(C) Inappropriate types of behavior or feelings under normal circumstances;

---

**2.** An IEP is defined in the IDEA as a written statement for a child with a disability that is developed in a meeting involving a local or State special education representative, the teacher, and the child's parents. *See* 20

U.S.C. § 1401(a)(20). The statement must include, among other things, the specific educational services to be provided to an eligible child. *Id.* § 1401(a)(20)(C).

(D) A general pervasive mood of unhappiness or depression; or

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

*Id.* 34 C.F.R. § 300.7(b)(9)(i) (emphasis added). However, neither the IDEA nor the federal regulations define the terms "need special education" or "adverse effect on educational performance," leaving it to each State to give substance to these terms.

## 2. *The Vermont Special Education Regulations*

The VSER, promulgated by the Vermont Department of Education, have been approved by the U.S. Department of Education. Rule 2362(1) establishes three eligibility criteria for special education that are consistent with the IDEA:

To be determined eligible for special education, an elementary or secondary student must receive a comprehensive evaluation ... under the auspices of a Basic Staffing Team[3] ...; and based on the results of the comprehensive evaluation, the Basic Staffing Team must determine that the student:

(a) meets one or more disability categories (Rule 2362.1);

(b) *exhibits the adverse effect of the disability on educational performance;* and

(c) is in need of special education.

VSER 2362(1) (emphasis added).

Rule 2362(2)(b) defines "adverse effect of the disability on educational performance" as follows:

To establish that a disability has an adverse effect on the student's educational performance, the Basic Staffing Team shall determine and document that the student is functioning significantly below expected age or grade norms, *in one or more of the basic skills.* This determination of adverse effect, usually defined as 1.0 standard deviation

or its equivalent, shall be documented and supported by two or more measures of school performance. These measures may include but are not limited to:

— parent or teacher observation
— grades
— curriculum-based measures
— work or language samples
— other test results.

VSER 2362(2)(b) (emphasis added).

Rule 2362(3) further provides:

[U]nless otherwise stated in an individual category of disability (Rule 2362.1), basic skill areas are defined as:

(a) oral expression;

(b) listening comprehension;

(c) written expression;

(d) basic reading skills;

(e) reading comprehension;

(f) mathematics calculation;

(g) mathematics reasoning; and

(h) motor skills.

VSER 2362(3).

## 3. *J.D.'s Eligibility*

### a. *"Adverse Effect" Measured by Effect on Basic Skills*

■ The defendants contend that J.D. did not meet the "adverse effect" eligibility criterion under Rule 2362(1). Relying on the list of basic skills in Rule 2362(3), the defendants argue that J.D.'s emotional disability had no adverse effect on his educational performance because he consistently performed at or above the level of his age cohorts in each of the enumerated areas. J.D., on the other hand, points out that Rule 2362(3) states that the list of basic skills is used to determine eligibility for special education, "unless otherwise stated in an individual category of disability (Rule 2362.1)." J.D. interprets Rule 2362(3) to mean that the basic skills enumerated therein do not apply to a student, such as himself, who has a disability enu-

---

3. The EPT convened by the School District is essentially the same as a Basic Staffing Team.

merated in Rule 2362.1. In lieu of the 2362(3) factors, J.D. argues that we should look to Rule 2362.1 for indicators of adverse effect. Rule 2362.1, entitled "Categories of Disability," states that "[t]he existence of one or more of the following categories of disability shall be established according to the criteria set forth below." Included among the categories is "emotional-behavioral disability":

An emotional-behavioral disability shall be identified by the occurrence of one or more of the following conditions exhibited over a long period of time and to a marked degree:

. . . . .

2. An inability to build or maintain satisfactory interpersonal relationships with peers and teachers;

3. Inappropriate types of behavior or feelings under normal circumstances;

4. A general pervasive mood of unhappiness or depression[.]

VSER 2362.1(1)(h). J.D. argues that the 2362.1(1)(h) list, not the 2362(3) list, must be used to discern whether his emotional-behavioral disability has caused an adverse effect.

Based on the language and structure of the VSER, we have no choice but to reject J.D.'s interpretation. First, Rule 2362.1(1)(h) provides that the criteria set forth therein shall be used to establish "the existence of" a covered disability (*i.e.,* the *first* eligibility criterion under Rule 2362(1)), not the presence of an adverse effect on educational performance (*i.e.,* the *second* eligibility criterion under Rule 2362(1)). This is confirmed by Rule 2362(1)(a) (existence of a disability), which specifically cross-references Rule 2362.1. In contrast, Rule 2362(1)(b) (adverse effect) does not cross-reference Rule 2362.1. Second, Rule 2362.1(1)(c), which defines the disability of visual impairment, expressly states: "For the purposes of this disability, mobility and orientation skills shall also be considered to be basic skills."

Such modification of the 2362(3) list of basic skills is what is meant by the phrase "unless otherwise stated in an individual category of disability" in Rule 2362(3). Thus, the district court correctly evaluated the effect of J.D.'s emotional-behavioral disability on his educational performance by reference to the basic skills in Rule 2362(3).

b. *Measures of Educational Performance*

J.D. also argues that his educational performance cannot be measured by his grades and achievement test results alone, which were indisputably at or above the norm for his age group. Rule 2362(2)(b) provides that the determination of adverse effect "shall be documented and supported by two or more measures of school performance," including, among others, grades and "other test results." Conversely, if a plaintiff is unable to identify at least two school performance measures that point to an adverse effect, the plaintiff would not qualify for special education under the IDEA. In this case, the district court highlighted J.D.'s grades and norm-referenced achievement test results as well as the psychologist's comments. *See J.D. II,* slip op., at 6, 12–13. These measures showed that J.D. consistently performed above the mean in math and other basic skills. Although not discussed in the district court's opinion, the record also contains reports and comments from teachers and various personality evaluations. For example, four teachers commented in J.D.'s 1995–1996 academic year report card that he exhibited "excellent application." One of these teachers also characterized his academic ability as "outstanding" compared to other applicants for college preparatory schools. Based on the overwhelming evidence in the record, the district court did not err in concluding that J.D.'s basic skills, and hence his educational performance, were not adversely affected by his disability within the meaning of the Vermont Rule.

J.D., on the other hand, emphasizes his emotional condition, including his difficulty with interpersonal relationships and negative feelings. However, while these are signs of an emotional disability, under the statutory and administrative schemes, they are not measures of an adverse effect on basic skills by which educational performance must be assessed. For this reason, this case is distinguishable from *Barnard Sch. Dist. v. R.M.*, 1983–84 EHLR Dec. 555:263 (D.Vt. Nov. 3, 1983), which J.D. cites. Although the student in that case performed well on certain standardized intelligence tests, the evidence also showed that, unlike J.D., his "school performance ha[d] ... been dismal" and that "he ha[d] obtained failing grades a number of times ... and his overall academic record [was] extremely poor." *Id.* at 264.

J.D. also relies on a Washington State administrative decision, *In re Kristopher H.*, 1985–86 EHLR Dec. 507:183 (Wash. Sept. 4, 1985), for the proposition that education "connotes all those processes cultivated by a given society as a means for the realization in the individual of the ideals of the community as a whole," not only proficiency in basic skills. *Id.* However, as the defendants correctly point out, the administrative law judge in that case applied a dictionary definition of "education" to evaluate Kristopher H.'s "educational performance," whereas here, we must apply Vermont's regulatory definition, which directs us to eight basic skills. Because J.D. has not established an adverse effect on any of these skills, we affirm the district court's holding that he is not eligible for special education under the IDEA.

## C. *The Procedural IDEA Claim*

We next consider J.D.'s claim that the State Defendants breached his procedural rights under the IDEA. In particular, J.D. charges that the State hearing officer denied him the opportunity to call and to cross-examine witnesses regarding the adverse effect criterion at a due process hearing, and failed to issue an opinion within 45 days of his request for a due process hearing.

### 1. *Due Process Hearing*

The IDEA requires any State educational agency that receives federal assistance to establish and maintain procedures to safeguard the right of children with disabilities to a free appropriate public education. *See* 20 U.S.C. § 1415(a); *Rowley*, 458 U.S. at 205–06, 102 S.Ct. 3034 (emphasizing the importance of the procedural safeguards). Among the required procedures is an opportunity to present complaints regarding "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." *See* 20 U.S.C. § 1415(b)(1)(E). Whenever a complaint has been received under subsection (b)(1)(E), "the parents or guardian shall have an opportunity for an impartial due process hearing which shall be conducted by the State educational agency or by the local educational agency ... as determined by State law or by the State educational agency." *Id.* § 1415(b)(2); *see* 34 C.F.R. § 300.506(a)-(b). Section 1415(d) further provides that "[a]ny party to any hearing conducted pursuant to subsections (b) and (c) of this section shall be accorded—... (2) the right to present evidence and confront, cross-examine, and compel the attendance of witnesses." 20 U.S.C. § 1415(d); *see* 34 C.F.R. § 300.508(a)(2). Although the language of the statute regarding due process hearings is mandatory, the purpose of an adversarial hearing is to resolve disputed issues of fact. Issues of law reside where they always have— with the adjudicator, whether an administrative or judicial officer. Nothing in the legislative history of the IDEA suggests that Congress intended to require an evidentiary hearing when the material facts are already established by ample affidavits and documents. In those situations, an adversarial hearing would be duplicative and a waste of administrative resources.

While not dispositive, we find it persuasive that summary disposition procedures are frequently used to decide IDEA claims that involve no disputed issues of fact. *See, e.g., James v. Upper Arlington City Sch. Dist.*, 987 F.Supp. 1017, 1018 (S.D.Ohio 1997)(granting defendants' motion for judgment on the pleadings); *Worcester Pub. Schs.*, 28 IDELR 1032 (Mass. Aug. 4, 1998) (granting summary judgment for parents); *Humble Indep. Sch. Dist.*, 25 IDELR 1169 (Tx. Apr. 3, 1997) (granting partial summary judgment for the school district); *District City 1 and Dist. City 2 Pub. Sch.*, 24 IDLER 1081 (Minn. Aug. 6, 1996) (collecting cases and noting that summary judgment motions are regularly applied in IDEA hearings in Minnesota). Thus, where the parties have had a meaningful opportunity to present evidence and the non-moving party is unable to identify any genuine issue of material fact, the use of a summary judgment procedure is entirely proper.

▉ Here, the uncontested facts based on sworn affidavits, a cumulative student record, and a psychological evaluation show that, notwithstanding J.D.'s emotional-behavioral disability, his basic skills consistently matched or exceeded those of his age cohorts; indeed, J.D.'s parents placed him in a private boarding school not because his basic skills were lagging, but so that he may be among his intellectually gifted peers.[4] The views of his advocate—Dr. Meisenhelder, some of his teachers, and his parents—are in the record and do not controvert the defendants' position that J.D. performed satisfactorily or better in each of the basic skill areas relative to his peers. Accordingly, the district court properly held that the State hearing officer did not violate J.D.'s rights under

§ 1415(b)(2) by deciding the case on summary judgment.

2. *The Forty–Five–Day Rule*

The federal regulations promulgated under the IDEA require a State agency to render a decision within forty-five days of receiving a request for a due process hearing. *See* 34 C.F.R. § 300.512(a). The State Defendants concede that the hearing officer did not meet this deadline. However, they contend that the bulk of the delay was excused partly by J.D.'s express waiver of the time from March 6 to April 21, 1997, inclusive, and by his implied waiver when he agreed to extensions of the briefing schedule. J.D. does not contest the express waiver through April 21, 1997. But, in a sworn affidavit, J.D.'s father denies having waived the subsequent delay, implying that he adhered to the briefing schedule under protest.

▉ Assuming J.D.'s version of events to be accurate, as we must, the hearing officer's June 18 oral decision dismissing the substantive IDEA claim and the comprehensive July 8 opinion—rendered thirteen and thirty-three days, respectively, after the expiration of the forty-five-day period—were plainly untimely under 34 C.F.R. § 300.512(a). However, relief is warranted only if we find, based on our independent review of the record, that the forty-five-day rule violation affected J.D.'s right to a free appropriate public education. *See Heather S.*, 125 F.3d at 1059 (citing *W.G. v. Board of Trustees*, 960 F.2d 1479, 1484 (9th Cir.1992) (citing *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir.1990))); *Evans v. Board of Educ.*, 930 F.Supp. 83, 93–94 (S.D.N.Y.1996); *see also* Fed.R.Civ.P. 61.[5]

---

4. Although the record shows that J.D.'s grades, on average, dropped in the 8th grade, they improved again in the 9th grade.

5. Fed.R.Civ.P. 61 provides, in relevant part:
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court ... is ground for

... vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

For reasons explained in Section B above, J.D. was properly found to be ineligible for special education on account of his above-average basic skills; *a fortiori* he was not denied a free appropriate public education at PHS. Therefore, he is not entitled to relief based on the 45–day rule violation.

## D. *The Section 504 Claim*

### 1. *The Rehabilitation Act*

 The Rehabilitation Act was enacted to promote, among other things, the inclusion and integration of persons with disabilities into mainstream society. *See* 29 U.S.C. § 701. To this end, § 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a). In the education field, the Rehabilitation Act complements the IDEA and the corresponding Vermont regulations. Whereas the latter authorities require federally funded State and local educational agencies to provide special education and related services to students who meet specified eligibility criteria, § 504 of the Rehabilitation Act prohibits such agencies from discriminating against students with disabilities. The federal regulations promulgated under § 504 with respect to education provide:

> A recipient that operates a public elementary or secondary education program shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap.

34 C.F.R. § 104.33(a). An "appropriate education" within the meaning of § 504 means:

> regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons *as adequately as the needs of nonhandicapped persons are met* and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

34 C.F.R. § 104.33(b)(1) (emphasis added). As is apparent from this definition, under the § 504 regulations, a student may have a viable discrimination claim even if his or her academic performance is satisfactory, provided the student establishes that he or she does not enjoy equal access to the school's programs. *Cf. Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir.1990) (discussing the elements of a prima facie violation of § 504).

 On the other hand, the duty to provide a free appropriate public education is not without limits. As the Supreme Court has explained in the higher education context, the Rehabilitation Act distinguishes "between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps." *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). While a federal funds recipient must offer "reasonable" accommodations to individuals with disabilities to ensure meaningful access to its federally funded program, § 504 does not mandate "substantial" changes to its program. *Alexander v. Choate*, 469 U.S. 287, 300 n. 20, 302–06, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (holding that § 504 does not require States to abandon their durational limits on reimbursement for inpatient hospital stays even though such limits may have a greater impact on Medicaid recipients with disabilities). We have also held that in evaluating the accommodation offered by a defendant, courts should be "[m]indful of the need to strike a balance between the rights of [the student and his parents] and the legitimate financial and administrative concerns of the School District." *Rothschild v. Grottenthaler*, 907 F.2d 286, 293 (2d

Cir.1990) (holding that requiring school district to provide sign-language interpreter for deaf parents of student at school-initiated conferences incident to student's education, but not at voluntary extra-curricular activities, was "reasonable accommodation").

Section 104.33(b)(2) of the federal regulations explains that implementation of an IEP is one way of ensuring the provision of a free appropriate public education. *See* 34 C.F.R. § 104.33(b)(2). Section 104.33(c)(3) requires a student with a disability to be placed in a public or private residential program at no cost to the person or his or her parents if that is necessary to provide a free appropriate public education. On the other hand, if a federal funds recipient "has made available ... a free appropriate public education to a handicapped person and the person's parents ... choose to place the person in a private school, the recipient is not required to pay for the person's education in the private school." *Id.* § 104.33(c)(4).

Furthermore, the federal regulations express a preference for educating qualified persons with disabilities "in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* § 104.34(a).

2. *The Proposed IEP*

■ The sole issue on appeal with respect to the § 504 claim is whether the proposed IEP constituted a reasonable accommodation. We find that it did.

As explained above, the multi-component IEP that the School District proposed to J.D. responded to the major recommendations of his psychologist. In addition to advanced placement courses at PHS, the program would have given him access to

some college-level courses at a nearby college (presumably at the School District's expense). Although the IEP would not have placed J.D. among intellectual peers of his own age, the School District did offer to provide individual counseling and training in peer relationship skills to cope with his feelings of isolation and frustration. We do not think that the School District's refusal to fund J.D.'s enrollment among intellectual peers of his own age, without more, amounts to discrimination. As noted above, the § 504 regulatory scheme expresses a preference for mainstreaming students with disabilities in a school district's regular school environment, unless that objective cannot be achieved even with the aid of supplementary services. Here, the overwhelming uncontroverted evidence shows that J.D.'s academic progress at PHS was exemplary. To the extent he was emotionally troubled, we cannot say that the counseling component of the IEP was an unreasonable accommodation, at least until such time, if ever, that it is proven ineffective.[6]

■ The heart of J.D.'s opposition to the proposed accommodation is that it was not optimal. However, § 504 does not require a public school district to provide students with disabilities with potential-maximizing education, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students.

J.D. points out that the law includes private residential schools as appropriate placements under § 504 when necessary to provide a free appropriate public education. The key words, however, are "when necessary." On this record, J.D. has failed to show that attendance at a private out-of-state boarding school was necessary. At most, the record reflects that Dr. Meisenhelder and a couple of the

6. Because we hold that the School District offered a reasonable accommodation to J.D., we need not decide whether a Vermont public school district is prohibited by law from providing post-secondary education and related services to a handicapped student, as the defendants argue.

teachers were concerned that J.D.'s emotional problems might worsen and his academic progress might suffer if he were not placed in an academic setting with intellectual equals of his own age. While we do not doubt the sincerity of these concerns, given the lack of any proof that the proposed counseling program would be ineffective, we are compelled to conclude that they are too speculative to raise a genuine issue of material fact as to the reasonableness of the proposed IEP.

J.D. also relies on another decision by the same hearing officer who ruled against him. *See In re: K.M.*, 29 IDELR 1027 (Vt. Jan. 22, 1999). However, the circumstances of the two cases are hardly comparable. K.M. was suicidal, repeatedly ran away from home, became truant, and fraternized with a group that abused drug and alcohol, to the detriment of her school performance. On the advice of a psychologist, K.M.'s parent enrolled her in a private boarding school, where K.M.'s behavior improved markedly. In granting the request of K.M.'s parents for reimbursement, the hearing officer found that the school district had failed to develop a specific IEP for the student or to offer an alternative placement to her parent. *See id.* In contrast, the present record contains no evidence that J.D. was out of control. On the contrary, J.D.'s father himself stated that J.D. responded constructively to parental pressure. The record is also devoid of any evidence that J.D. engaged in the types of high-risk behavior that necessitated a boarding school environment for K.M. Moreover, unlike that case, the School District here offered J.D. a specific program designed to address his academic and emotional needs.[7]

In sum, although we sympathize with the understandable desire of J.D.'s parents to provide the best possible education for their academically gifted child, we find no error in the district court's holding that

the defendants did not discriminate against J.D. in violation of § 504 by declining to reimburse him for tuition and costs at an out-of-state residential school.

At bottom, in the matter before us, we as a court are constrained because this case involves issues of policy that are the domain of the legislative and administrative branches.

### CONCLUSION

For the reasons explained above, the judgment of the district court is affirmed.

---

7. To the extent that J.D. argues that the offer of accommodation was unreasonable because it was untimely, he has failed to explain how it was untimely. We therefore decline to address this contention.