929 A.2d 136

**JOHN A., et ux., Next Friends of A.A.**

**v.**

**BOARD OF EDUCATION FOR HOWARD COUNTY.**

No. 132, Sept. Term, 2006.

Court of Appeals of Maryland.

July 30, 2007.

364

366

368

Kenneth E. McPherson, Riverdale, for appellant.

Jeffrey A. Krew (Jeffrey A. Krew, LLC, Ellicott City, on brief), for appellee.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER, (Retired, specially assigned), JJ.

HARRELL, J.

We issued a writ of certiorari to the Court of Special Appeals, before it decided the appeal in this case, to consider whether the Circuit Court for Howard County erred when it affirmed the Administrative Law Judge's ("ALJ") order dismissing Appellants' due process complaint for lack of subject matter jurisdiction under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 to 1419 (2000 & Supp. IV 2004),[1,2] and its Maryland counterpart, Maryland Code (1978, 2006 Repl.Vol.), Education Article ("Education"),

---

1. In December 2004, after Appellants in this case filed for a due process administrative hearing, Congress enacted the Individuals With Disabilities Education Improvement Act of 2004, Pub.L. No. 108–446, 118 Stat. 2647, which revised certain portions of the IDEA. These changes do not affect our resolution of the issues presented in this case.

2. The regulations implementing this statute are found at 34 C.F.R. §§ 300.1 to 300.818 (2006).

§§ 8–401 to 8–417.[3,4] The basis for the ALJ's conclusion was that the dispute involved a medical or ethical, rather than a special education, issue.

## I.

### A.

### *Background*

Congress passed the IDEA in order to provide "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The Act also "ensure[s] that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). To encourage states to enact procedures that further the goal of providing educational services to disabled children, Congress allots public money to states that adopt regulations in accordance with the provisions of the IDEA. 20 U.S.C. § 1411(a)(1).

In order to receive federal funding, states must provide a "free appropriate public education"[5] ("FAPE") to each indi-

---

**3.** In 2006, the General Assembly enacted Chapter 44, § 6 and Chapter 233 of the Acts of 2006, which updated provisions of the Maryland counterpart to the IDEA. As with Congress's 2004 amendments to the IDEA, these changes do not affect our resolution of the issues presented in this case.

**4.** The regulations implementing this statute are found at COMAR §§ 13A.05.01.01 to 13A.05.01.16.

**5.** 20 U.S.C. § 1401(9) (2000 & Supp. IV 2004), in pertinent part, provides:

Free appropriate public education. The term "free appropriate public education" means special education and related services that—
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

vidual between the ages of three and twenty-one who qualifies as a "child with a disability." [6] 20 U.S.C. § 1412(a); *accord* Education § 8–403(a). In addition to direct special education programs, school systems must also provide "related services" [7] to all children who qualify under the IDEA. 20 U.S.C. § 1411(a)(1); *accord* Education § 8–403(b). To determine the scope of the special education and "related services" to be provided so that disabled children may access their FAPE, the school system must evaluate each child with a disability and develop an "individualized education plan" [8] ("IEP") to address

---

(D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d) ].

*Accord* Md.Code (1978, Repl.Vol.2006), Education Article ("Education"), § 8–401(a)(3).

**6.** 20 U.S.C. § 1401(3), in pertinent part, provides:

Child with a disability.

(A) In general. The term "child with a disability" means a child—

(i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

(ii) who, by reason thereof, needs special education and related services.

*Accord* Education § 8–401(a)(2).

**7.** 20 U.S.C. § 1401(26), in pertinent part, provides:

Related services.

(A) In general. The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluative purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

*Accord* Education § 8–401(a)(5).

**8.** 20 U.S.C. § 1401(14), in pertinent part, provides:

Individualized education program; IEP. The terms "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414(d) ].

his or her specific needs. 20 U.S.C. § 1414(b)(2); *accord* COMAR §§ 13A.05.01.03(B), 13A.05.01.06. The IEP consists of special instruction and support services calculated to address the child's special education and related service needs to achieve annual goals set by an IEP Team. 20 U.S.C. § 1414(d); *accord* COMAR § 13A.05.01.09. The IEP Team consists of teachers, administrators, health personnel, other experts, and the parents of the child who convene to analyze the needs of the child and the goals for the child's development, resulting in a written IEP outlining the program to be implemented. 20 U.S.C. § 1414(d); *accord* COMAR § 13A.05.01.07.

■ The IDEA prescribes a number of procedural safeguards that individual states must make available for parents and disabled children who claim a denial of the child's right to a FAPE.[9] 20 U.S.C. § 1415; *accord* Education § 8–413. Congress intended these safeguards to protect parents' participation in the ongoing development of their child's educational program. *Sch. Comm. of the Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 361, 105 S.Ct. 1996, 1998, 85 L.Ed.2d 385 (1985). Either a disabled child's parents or a school board may file a complaint with the appropriate educational agency "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6); *accord* COMAR § 13A.05.01.15(c)(1). In such a complaint, a party may request an "impartial due process hearing, which shall be conducted by the State edu-

---

*Accord* Education § 8–408(a)(4).

**9.** 20 U.S.C. § 1415(a), in pertinent part, provides:
Establishment of procedures.
(1) Any state educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.
*Accord* Education § 8–413.

cational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f); *accord* Education § 8–413(d).

Following the administrative disposition of a due process complaint, "any party aggrieved by the findings and decision . . . shall have the right to bring a civil action with respect to the complaint . . . which action may be brought in any State court of competent jurisdiction." 20 U.S.C. § 1415(i)(2)(A); *accord* Education § 8–413(j). The state court, in such an action, "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

In accordance with the requirements to receive funding from the Federal government under the IDEA, Maryland adopted Education § § 8–401 to 8–417, which substantially mimics the language of the federal IDEA statute. Further, the Maryland statutory scheme states that "all proceedings held and decisions made pursuant to this subtitle shall be in conformance with applicable federal law." [10] Education § 8–407. Accordingly, the Maryland statutory scheme provides similarly for procedural safeguards to protect the rights of disabled children and their parents. Education § 8–413. Either a disabled child's parents or a school board may lodge a due process complaint with the State educational agency and the Maryland Office of Administrative Hearings ("OAH") [11] "to resolve a dispute over the identification, evaluation, educational placement, or the provision of free appropriate public education, in accordance with federal law." Education § 8–413(a)(3). The ALJ appointed to hear the dispute may, "after

---

**10.** The Maryland counterpart to the IDEA defines "federal law" as "the IDEA and regulations adopted under that Act." Education § 8–413(a)(4).

**11.** The Office of Administrative Hearings ("OAH") is delegated the authority and responsibility to conduct the hearing and render the final administrative decision in such cases. Education § 8–413(d).

review of the education records of the child, dismiss any request for review which does not relate to" the identification, evaluation, educational placement, or the provision of free appropriate public education to the child. Education § 8–413. As required by the IDEA, Maryland law authorizes judicial review of these administrative decisions by the U.S. District Court for the District of Maryland or by the circuit court for the county in which the child resides. Education § 8–413(j); Md.Code (1984, Repl.Vol.2004, Supp.2006), State Government Article, § 10–222.[12] A party aggrieved by the final judgment of a circuit court may appeal to the Court of Special Appeals in the manner that the law provides for appeal of civil cases. Md.Code (1984, Repl.Vol.2004, Supp.2006), State Government Article, § 10–223(b).

## B.

### *The Present Case*

The dispute in this case arose during the 2002–03 and 2003–04 school years, while John A.'s daughter, A.A., was attending Rockburn Elementary in Howard County. Appellee, the Board of Education for Howard County, administers the How-

---

**12.** Maryland Code (1984, Repl.Vol.2004, Supp.2006), State Government Article § 10–222, in pertinent part, provides:

(a)(1) Except as provided in (b), a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.

\* \* \*

(h) In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary and capricious.

ard County Public Schools ("HCPS"). During all times relevant to this litigation, A.A. qualified as a "child with a disability," pursuant to the IDEA, because she suffered from Bi-Polar Disorder, Attention Deficit Hyperactivity Disorder ("ADHD"), and Sensory Integration Disorder. As a result, beginning in October 2002, A.A. received special education and certain related services from the HCPS in accordance with an IEP developed and implemented by A.A.'s parents, a special education teacher, a psychologist, an occupational therapist, a behavior specialist, and the principal of Rockburn Elementary School (the IEP Team). The IEP applicable to A.A., under "Special Education and Related Services," listed "Instruction," "Psychological Services," and "Occupational Therapy" as the services to be provided by the HCPS.[13] In addition to the IEP and the IEP "Team Meeting Summary" documents, the parents signed a "Request for Records" form consenting to the release of A.A.'s confidential psychiatric records to the HCPS, expressly conditioned on the parents being informed before the HCPS or its agents and employees contacted A.A.'s psychiatrist.

In accordance with an agreement with the HCPS signed by A.A.'s treating psychiatrist, Dr. Harold Eist, the school nurse at Rockburn administered to A.A. two medications, Geodon and Neurontin, during the 2002–03 school year.[14] During the

---

**13.** The parents maintain that, during the October 2002 IEP Team Meeting, the IEP Team noted that A.A.'s tremors increased since the preceding school year and arranged for A.A. to receive her new prescription medications during the school day, as part of the IEP. They also claim that, on the day of the IEP Team Meeting, the parties executed an IEP and related documents, including a Team Meeting Summary, a Consent Form for the release of A.A.'s psychiatric records, and a Medication Form, which contemplated the administration by Rockburn staff of medication to A.A. while at school.

**14.** According to the parents, these drugs serve to reduce A.A.'s symptoms from her afflictions, which include restlessness, general inattention, and inability to follow through on tasks. The parents claim that these symptoms are health impairments that inhibit or disable A.A. from learning in the usual educational setting. Thus, A.A. requires specialized professionals, administration of medications, and psychiatric counseling and therapy if she is to receive a FAPE.

school year, teachers and health room personnel at Rockburn observed A.A. as being lethargic and drowsy, sometimes falling asleep in class and in the health room.

In August 2003, Dr. Eist added another medication, Inderal, to the child's drug regimen to treat her ADHD and Bi–Polar Disorder. Shortly thereafter, in early October 2003, a school nurse wrote to Dr. Eist to inform him that, at the time A.A. was administered her medications, Rockburn staff observed that, prior to the administration of her medications, A.A. was lethargic and had fallen asleep in class, and that her apical pulse rate was between 110 and 142. The letter explained that, during classroom observations, school health personnel noticed that A.A.'s eyes were closed several times, that she was lying sideways on her desk with her head resting on her arm, had a dazed or staring expression, and appeared not to be focusing on her lessons. As a result, the school nurse requested clarification from Dr. Eist concerning the administration of A.A.'s medications when possible symptoms contraindicating further drug administration were noted and sought boundary standards as to when the medication should be withheld. A copy of this letter was sent to the parents.[15]

On 15 October 2003, A.A.'s parents informed Dr. Eist that it was their understanding from the nurse's letter that the HCPS sought discretion to refrain from administering the child's medications based upon its physical observations. The parents expressed their disapproval of such a request and asked Dr. Eist to respect A.A.'s right to privacy and provide no further information to the HCPS or its employees regarding A.A.'s medical condition and treatment, absent their prior consent or in the case of a bona fide medical emergency.

Accordingly, in response to the school nurse's letter, Dr. Eist's attorney advised her and the HCPS that Dr. Eist would not release A.A.'s confidential medical information unless

---

15. It seems the nurse was concerned that A.A.'s lethargy and related conditions might suggest that the strength of the dosages of the about-to-be-administered, or the previously administered dosages of, drugs were the cause of A.A.'s symptoms.

there was parental consent or he otherwise was compelled by law to do so. The attorney explained that Dr. Eist would not change the medications prescribed for A.A., the nurse and the HCPS were expected to continue to administer the medications according to Dr. Eist's orders,[16] and A.A. should not be removed from class for pulse readings.

On 25 November 2003, Donna Heller, the HCPS's health services manager, wrote to Dr. Eist (with a copy to the parents) to make clear that neither the nurse nor the HCPS was asking the psychiatrist to change the prescribed medications and emphasizing that, in order to ensure the child's safety, the request simply was for clarification and standards for when the medications should be withheld based on symptoms noted at the time of administration. According to the health services manager, a registered nurse, she consulted the 2004 Nursing Drug Handbook which dictated that nurses should "always check patient's apical pulse rate before giving [the] drug (Inderal)" and, "if extremes in pulse rates occur, withhold [the] drug and notify [the] presciber immediately." She informed Dr. Eist that she consulted with the Maryland Board of Nursing and that counsel for that Board advised that rote administration of the medications without the ability to communicate directly with the prescribing psychiatrist would be inappropriate. The health services manager concluded that, based on the symptoms observed by the nursing staff, combined with a lack of guidance from Dr. Eist and, in the absence of the ability to communicate with him directly, the HCPS's staff no longer would administer the medication to A.A., beginning on 2 December 2003. Ms. Heller suggested that either of A.A.'s parents would be free to come to Rockburn and administer the medications to their daughter during the school day.[17]

---

**16.** According to the parents, Dr. Eist told the nurse specifically, that she should "never [with]hold school meds [because of] symptoms of sleepiness or lethargy."

**17.** In a letter dated 2 December 2003, Dr. Eist's attorney wrote to counsel for the HCPS conceding that "in the circumstances, without

In response to the HCPS's letter, A.A.'s parents insisted that the HCPS abide by the psychiatrist's orders to administer the medications to A.A. during the school day at the prescribed time and in the prescribed dosages. The HCPS refused and reaffirmed to A.A.'s parents that, because the HCPS and Rockburn staff would not administer the medications under the circumstances, they were welcome to come to A.A.'s school to accomplish the tasks on a daily basis.

On 9 June 2004, A.A.'s parents filed a request for a due process hearing under the provisions of the IDEA and its Maryland counterpart, asserting that the HCPS's refusal to administer the three medications in accordance with Dr. Eist's instructions constituted a denial of A.A.'s FAPE. They sought an administrative order requiring the HCPS to abide by Dr. Eist's medical directives and administer the medication to A.A. during the school day.

At the outset of the due process hearing before the ALJ, the HCPS's attorney challenged the ALJ's subject matter jurisdiction under the IDEA to consider the issues presented in the parents' hearing request. The ALJ ordered the HCPS to file its motion to dismiss in writing and continued the hearing. Shortly thereafter, the HCPS submitted a Motion to Dismiss or in the Alternative Motion for Summary Decision for failure to state a claim under the IDEA.

The HCPS argued that, under the IDEA and Maryland law, a due process hearing may be conducted only when the dispute pertains to the "identification, evaluation, or placement of the child, or the provision of a free appropriate public education to such child." The parents' due process request, however, did not implicate any of the four categories of appropriate jurisdiction for the ALJ because the dispute did not concern A.A.'s special education rights. Rather, the HCPS claimed that the only issue presented by the dispute was whether the HCPS's action exceeded the standard of care

the parents' permission, it does not seem unreasonable for the Howard County Public School System to require [A.A.'s] parents to administer the medication while she is at school."

applicable to the nursing profession when it insisted that the school employee designated to administer the drugs be allowed to consult with the treating physician in order to obtain clarification and boundaries for when the medication should be withheld based on symptoms noted at the time of administration.[18]

Conversely, A.A.'s parents argued on her behalf that the issue was whether the HCPS acted reasonably in demanding that the parents waive their and A.A.'s medical privacy rights [19] in exchange for the continuation of the administration of medication to a child which, the HCPS conceded, generally would be considered a "related service" under the IDEA. The parents maintained that they were prepared to disprove the factual predicate upon which the HCPS relied, namely, the effect of the medications on A.A. and the potential ramifications of discontinuing the medication regime.[20]

In granting the HCPS's motion to dismiss, the ALJ emphasized that "while the rights of parents and guardians are extensive, the scope of due process hearings is limited to 'complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child or the provision of a free, appropriate education to such child.'" The

---

18. In support of this position, HCPS offered Dr. Eist's attorney's letter stating that he believed it would not be unreasonable for the HCPS to refuse to administer medication in the absence of the unfettered ability to contact the prescribing physician directly.

19. Whether there was a genuine Health Insurance Portability and Accountability Act ("HIPAA"), 29 U.S.C. §§ 1181–1187 (2000), or other statutory or common law medical information privacy or privilege issue was not resolved.

20. The parents proffer that Dr. Eist was present at the hearing, ready to testify that A.A.'s afflictions impair her educational performance, that these conditions cause cycles of extreme excitement and agitation and extreme sadness or irritability, that the symptoms impair A.A.'s ability to learn in the usual educational setting, that A.A. requires a strict regimen of medications to control her symptoms, that disruption would affect adversely A.A.'s opportunity to receive an appropriate education, and that A.A.'s fluctuations in pulse rate and lethargy were not caused by the medications and do not justify interrupting her medication regimen.

ALJ found that the complaint did not allege that there was any dispute as to the proper identification of A.A. as a "child with a disability," her evaluation, or her educational placement. Further, the ALJ found that the issue presented involved "the rights of the Parents to control the release of medical information about their child against the right of nurses to speak to the treating physician when administering medication the physician prescribed," rather than the "provision of a free appropriate public education." The ALJ determined that this issue raised a medical treatment, or ethical, question, rather than a special education one. Therefore, the dispute raised in the parent's complaint fell outside of the scope of the IDEA, depriving the ALJ of subject matter jurisdiction. Accordingly, the ALJ dismissed the parents' due process complaint.

Upon the parents' petition for judicial review, the Circuit Court for Howard County affirmed the ALJ's order dismissing the parents' IDEA claim.[21] The Circuit Court found that the issue was not whether A.A. requires medication to participate in her education but rather, whether the school has the right to request additional direction from the child's treating/prescribing physician. The court determined that this issue was not covered by the provisions of the IDEA and, thus, the ALJ correctly dismissed the parents' complaint for lack of subject matter jurisdiction.

A.A.'s parents noted a timely appeal to the Court of Special Appeals. Appellants, in their brief to the intermediate appellate court, posed the issue as whether the ALJ had subject matter jurisdiction under the IDEA or the Education Article to compel the HCPS to provide the medication as a "related service" that had been arranged in conjunction with a negoti-

---

21. In a complaint intended to serve as a petition for judicial review of the ALJ's decision, A.A.'s parents also brought claims against the HCPS under Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 1983, and Article 24 of the Maryland Declaration of Rights. The Circuit Court dismissed, without prejudice, these other claims against the HCPS because they had been brought improperly as original claims in conjunction with the petition for judicial review.

ated IEP. We, on our initiative, issued a writ of certiorari to the Court of Special Appeals before it decided the appeal in this case. 397 Md. 107, 916 A.2d 256 (2007).

## II.

### Standard of Review

We review the ALJ's decision according to the same statutory standards[22] as did the circuit court. *Dep't of Pub. Safety and Corr. Servs. v. Demby*, 390 Md. 580, 614, 890 A.2d 310, 330 (2006); *Schwartz v. Dep't of Nat'l Res.*, 385 Md. 534, 553, 870 A.2d 168, 179–80 (2005); *Charles County Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 294, 855 A.2d 313, 318 (2004). Thus, the inquiry is not whether the Circuit Court erred, but whether the ALJ erred. *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005); *Spencer v. State Bd. of Pharmacy*, 380 Md. 515, 524, 846 A.2d 341, 346 (2004).

As explained recently for the Court by Judge Eldridge in *Maryland Aviation Administration v. Noland*, "[a] court's role in reviewing an administrative agency adjudicatory decision is narrow . . .; it 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determin[ing] if the administrative decision is premised upon an erroneous conclusion of law.' " 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005) (quoting *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–69, 729 A.2d 376, 380–81 (1999)); *United Parcel Serv., Inc. v. People's Counsel*, 336 Md. 569, 576, 650 A.2d 226, 230 (1994). The reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record. *Noland*, 386 Md. at 571, 873 A.2d at 1154; *CBS v. Comptroller*, 319 Md. 687, 698, 575 A.2d 324, 329 (1990).

In reviewing an agency's legal conclusions, it is a fundamental principle of administrative law that a reviewing

---

22. *See* Md.Code (1984, Repl.Vol.2004, Supp.2006), State Government Article, § 10–222.

court should not substitute its judgment for the expertise of those persons who constitute the administrative agency. *Noland,* 386 Md. at 571–72, 873 A.2d at 1154; *Belvoir Farms Homeowners Ass'n v. North,* 355 Md. 259, 268, 734 A.2d 227, 232 (1999); *United Parcel Serv., Inc.,* 336 Md. at 576–77, 650 A.2d at 230. Although we often will give considerable weight to the agency's experience in interpreting a statute that it administers, *Noland,* 386 Md. at 572, 873 A.2d at 1154, it is within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy the situation if found to be wrong. *Schwartz,* 385 Md. at 554, 870 A.2d at 180; *Christopher v. Montgomery County Dep't of Health,* 381 Md. 188, 199, 849 A.2d 46, 52 (2004); *Balt. Lutheran High Sch. Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985).

## III.

### *Discussion*

Appellants claim that the ALJ possessed subject matter jurisdiction to adjudicate their complaint because the administration of medication was a "related service" which the HCPS was required to provide in accordance with the IEP applicable to A.A. They believe that the dispute in this case relates to the "identification, evaluation, or placement of the child, or the provision of a free appropriate public education to such child," and thus falls within the class of issues to be addressed through the procedural protections provided by the IDEA and its Maryland counterpart. As a threshold issue, we must determine whether, as Appellee claims, the absence of an "administration of medication" provision from the four corners of A.A.'s IEP precludes necessarily any complaint based on provision of the service.

### A.

### *Omission of Administration of Medication from the IEP*

The provision of a FAPE, which a state must satisfy with respect to all disabled children, necessarily includes

personalized instruction and such supportive services as are "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Bd. of Educ. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3042, 73 L.Ed.2d 690 (1982). As discussed previously, the IEP serves as the blueprint for the special education services provided to disabled children to ensure their proper access to a FAPE.

Appellee relies heavily on the fact that "administration of medication" is not enumerated in A.A.'s IEP as a "related service" to be provided by the HCPS. The HCPS claims that, while the IDEA contemplates generally the administration of medication as a potential "related service," not every disabled child is entitled to every potential "related service" mentioned in the IDEA. Instead, it argues, the "related services" due a child are restricted to those contained in his or her particular IEP, which presumably is tailored to his or her special circumstances, unless or until the child's parents petition to have an additional service added. Simply put, the HCPS contends that, because A.A.'s IEP does not enumerate the administration of medication as a specific "related service" in her case, she is not entitled to such a service under the IDEA.

In response, A.A.'s parents point to the October 2002 IEP Team Meeting, at which they signed forms [23] that reflected the parties' agreement that the HCPS would administer Indural, Geodon, and Nurontin at 12:30 p.m. each school day. The parents argue that, by signing these forms, the HCPS was agreeing to provide the medications to A.A. as a service related to A.A.'s special education plan, notwithstanding there being no mention of the administration of these medications in the IEP itself. Therefore, according to the parents, the provision of A.A.'s medications should be considered effectively as part of A.A.'s IEP. They also contend that, for the purposes of the motion to dismiss, the HCPS twice

---

**23.** The forms included the "IEP Team Meeting Summary," the "Request for Records," the "Release of Howard County Public School System Records," and the "HCPSS School Health Services Medication Form."

conceded that it was obligated to administer the medications to A.A. as a "related service." Because we hold that a "related service" need not be included necessarily in the child's IEP in order to form the basis for a due process complaint, we forgo a determination on this record whether the "administration of medication" was included implicitly in A.A.'s IEP. This conclusion comports not only with relevant case law, but with the overarching purpose of the IDEA to ensure that all disabled children have access to a free appropriate public education.

 Precedent of the U.S. Supreme Court supports our conclusion that the administration of medication constitutes a "related service," whether mentioned in an IEP or not. In *Irving Independent School District v. Tatro,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984), the Supreme Court considered whether a school board was required by the IDEA to provide clean intermittent catheterization ("CIC") to a child with a disability, even though the service was not contained in her IEP. 468 U.S. at 885, 104 S.Ct. at 3373. The Court outlined a two-step process to determine whether the school must provide a "related service." The first step is to consider whether the service is a "supportive service ... required to assist a handicapped child to benefit from special education," and the second step is to determine whether the service is excluded from this definition as a "medical service" serving purposes other than diagnosis or evaluation. *Tatro,* 468 U.S. at 890, 104 S.Ct. at 3375–76.

The *Tatro* Court concluded that the child required a CIC in order to remain in class and benefit from her special education program and that the service could be "performed in a few minutes by a layperson with less than an hour's training." *Tatro,* 468 U.S. at 885–88, 104 S.Ct. at 3373–75. Therefore, the Court affirmed the order of the District Court, mandating that the board of education modify the child's IEP to include the provision of CIC during school hours. *Tatro,* 468 U.S. at 888, 104 S.Ct. at 3375.

Similarly, in *Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999), the parents of a ventilator-dependent child, who required constant individual services throughout the school day, requested that the school district accept financial responsibility for the child's health care services. *Cedar Rapids*, 526 U.S. at 69–70, 119 S.Ct. at 995–96. The district denied the request, claiming it was not legally obligated to provide continuous, one-on-one nursing services. *Cedar Rapids*, 526 U.S. at 70, 119 S.Ct. at 996. Following its decision in *Tatro*, the Court held that the school district could only refuse to provide medical services which inherently must be performed by a physician. *Cedar Rapids*, 526 U.S. at 74, 119 S.Ct. at 997 (citing *Tatro*, 468 U.S. at 892–94, 104 S.Ct. at 3377–78). Although the child's IEP did not contain any reference to "administration of medication," the district was held to be required to provide the child's service because the individualized care requested did not demand the training, knowledge, and judgment of a licensed physician and was necessary for the child to access her FAPE. *Cedar Rapids*, 526 U.S. at 74, 119 S.Ct. at 997.

The Supreme Court's decisions in *Tatro* and *Cedar Rapids* suggest that an IEP does not take the form of a strict contractual relationship between the parties and is not the be-all-end-all of those services, and only those services, which must be provided to a disabled child. The HCPS, in its brief, advances this very claim, relying on *Ms. K., Mother and Next Friend of S.B. v. City of South Portland*, 407 F.Supp.2d 290, 301 (D.Me.2006), to explain that an IEP is not governed by the law of contracts and is not itself a legally binding contract. In this regard, it is entirely correct. Because an IEP is not evaluated as if it were a fully-integrated contract, an appropriate administrative body, here the ALJ, could order, based on a due process complaint, the IEP to be modified so that it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. While an IEP document may reflect the discussions and educational plan contemplated for a disabled child, a school district is nonetheless required to provide the child with a

FAPE, which includes personalized instruction and such supportive services as are necessary to fulfill the underlying purpose of the IDEA.

Thus, the fact that A.A.'s IEP does not acknowledge explicitly A.A.'s entitlement to the administration of medication is not determinative in this case. The absence of an administration of medication provision from A.A.'s IEP does not portend that such a service is not required by the IDEA. Rather, *Tatro* and *Rowley* stand for the proposition that if a particular service necessary for a disabled child to access their FAPE is absent from their IEP, such a shortcoming or oversight may not be used to defeat a disabled child's otherwise legitimate claim under the IDEA. We agree with A.A.'s parents that the provision of a FAPE necessarily includes the provision of all "related services" contemplated by the IDEA and others reasonably calculated to be necessary for the child to benefit from his or her specialized education. In both *Tatro* and *Cedar Rapids,* the related services were not outlined in the children's IEP's, yet the Supreme Court nonetheless required the school boards in those cases to provide the services and allowed claims for such unrecognized services to form the basis of IDEA due process complaints.

We recognize that, generally, a court should not intervene in questions of educational policy so long as a school district has offered a program of specialized services reasonably calculated to enable a child to receive educational benefit. *Gill v. Columbia 93 Sch. Dist.,* 217 F.3d 1027, 1037 (8th Cir.2000). Here, it is undisputed that A.A. generally requires these medications (at some dosage strength) in order to have a chance to function more normally in the classroom setting and attain the benefits of her special education, thus meeting the definition of "supportive services." Justifying withholding the medications from A.A. simply because the service is not enumerated in her IEP would be contrary to the principle that a school must provide the services that enable the child to benefit from special education. Additionally, the record here reflects that the medications easily can be provided by some-

one other than a trained physician, such as a school nurse, and therefore are not an excluded "medical service." [24] Thus, under the apparent facts in this case, the administration of these medications to A.A. would be a "related service."

### B.

### *Application of the IDEA to the Parties' Dispute*

The parties' dispute consists essentially of whether school nurses who administer medications to A.A. should have the ability to communicate directly with the prescribing physician or whether her parents have the power to restrict access to the physician until they are contacted and approve of any specific contact with that physician. In determining whether the ALJ who heard this dispute under the IDEA erred in dismissing Appellants' complaint for lack of subject matter jurisdiction, we must explore the language and legislative intent of the IDEA and its Maryland counterpart in order to resolve whether the legislative schemes contemplate claims such as Appellants' here.

### 1.

### *Legislative Purpose of the IDEA and*
### *its Maryland Counterpart*

In enacting the IDEA, Congress intended "to open the door of public education" to all qualified children and "require participating States to educate handicapped children with nonhandicapped children whenever possible." *Rowley,* 458 U.S. at 192, 202, 102 S.Ct. at 3043, 3049. The IDEA was meant to assist the large number of disabled children who were "either totally excluded from schools or sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" *Schaffer v. Weast,* 546 U.S. 49, 126

---

**24.** *See Irving Indep. Sch. Dist. v. Tatro,* 468 U.S. 883, 894, 104 S.Ct. 3371, 3378, 82 L.Ed.2d 664 (1984) (explaining that "school nursing services must be provided only if they can be performed by a nurse or other qualified person, not if they must be performed by a physician.")

S.Ct. 528, 531, 163 L.Ed.2d 387 (2005) (quoting H.R.Rep. No. 94–332, at 2 (1975)). Accordingly, states must provide "an appropriate education designed to meet the specific needs of the handicapped child at no cost to that child's parent." S.Rep. No. 94–168, at 10 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1434.

■■■ The touchstone of the IDEA is the actual provision of a FAPE. *Sellers v. Sch. Bd. of Mannassas,* 141 F.3d 524, 527 (4th Cir.1998). To advance this goal, Congress, in the IDEA, provided a panoply of procedural rights to parents to ensure their involvement in decisions about their disabled child's education. *Id.* At the apex of these procedural rights is an impartial due process hearing in which aggrieved parents may air their complaints, with respect to their disabled child's identification, evaluation, placement, and receipt of a FAPE. *Id.*

2.

*Subject Matter Jurisdiction under the IDEA*

■■■ Subject matter jurisdiction is the court's ability to adjudicate a controversy of a particular kind. *Henderson v. United States,* 517 U.S. 654, 671, 116 S.Ct. 1638, 1647, 134 L.Ed.2d 880 (1996). If, by the law that defines the authority of the court, a judicial body is given the power to render a judgment over that class of cases within which a particular case falls, the court has subject matter jurisdiction. *First Federated Commodity Trust Corp. v. Comm'r of Sec.,* 272 Md. 329, 335, 322 A.2d 539, 543 (1974).

■■■ The powers of the OAH and its ALJ's are measured by the granting statute. *Boyd v. Supervisor of Assessments,* 57 Md.App. 603, 608, 471 A.2d 749, 751 (1984). An ALJ cannot enlarge agency jurisdiction, nor may subject matter jurisdiction be conferred upon the agency by the courts or the parties before the OAH. *Boyd,* 57 Md.App. at 608, 471 A.2d at 751–52. The scope of an administrative hearing is limited to the matters contained in the "complaint" filed

triggering the hearing. *County of San Diego v. Cal. Special Educ. Hearing Office,* 93 F.3d 1458, 1465 (9th Cir.1996).

■■■ In the instant case, the ALJ concluded "as a matter of law, that the Parents' request for an administrative order requiring HCPS officials to administer the Child medication without the right of school officials to consult the physician in order to obtain clarification and parameters of when the medication should be withheld based on symptoms noted at the time of administration be dismissed for failure to state a claim upon which relief can be granted under the IDEA or Maryland special education law," because the dispute was outside of his statutory jurisdiction to hear only special education complaints.

A.A.'s parents maintain that the ALJ had subject matter jurisdiction under the IDEA and/or the Maryland Education Article to compel the HCPS to provide medication to A.A., on the terms dictated by them, because the administration of medication is a "related service." Accordingly, the HCPS's discontinuation of administration of A.A.'s medications falls into the ALJ's jurisdiction to hear disputes concerning "any matter relating to the ... provision of a free appropriate public education to [a] child." They argue that if the IDEA, or any of the regulations issued pursuant to it, encompass the administration of medication, then the OAH has the authority to resolve the parties' dispute. Referring to *Sellers,* the parents argue that, when a school system seeks to change a child's identification, evaluation, placement, or receipt of a free appropriate public education, the parents are entitled to "air [those] complaints to an 'impartial due process hearing.'" 141 F.3d at 527. The parents essentially contend that the HCPS's action constitutes a refusal or change of a related service, or the imposition of unjustified conditions on the delivery of such service, entitling them to a due process hearing under the IDEA to challenge that action. Were it otherwise, they claim the IDEA would be transformed from a cooperative process to a situation where a school board may dictate unilateral changes in the delivery of related services to disabled children.

Appellee insists that the ALJ's subject matter jurisdiction is limited to the four categories outlined in the IDEA statute, namely, disputes concerning the identification, evaluation, and placement of a disabled child, or the provision of a FAPE to that child. Accordingly, it contends that this particular dispute, concerning the right of parents of a disabled child to require a school to contact them for approval before speaking to the child's treating psychiatrist regarding the consequences of administering medication, falls outside of that jurisdiction. The HCPS argues that its request for the nurse to contact the psychiatrist did not constitute the imposition of a change regarding the administration of medication, but instead was a request for clarification of how and when decisions may be arrived at for withholding medication should observed conditions warrant that. It claims that the simple fact that the IDEA deems the administration of medication potentially a related service does not mean necessarily that any dispute that is somehow related to the provision of that related service is within the jurisdiction of the ALJ.

We disagree with the parents' contention that the particular dispute in this case sufficiently touches and concerns a "related service" within the contemplation of the regulatory scheme. The dispute in this case is not so much over the administration of medications to a child, which the HCPS concedes is deemed generally a "related service" contemplated by the IDEA, but instead relates to the ability of a child's parents to regulate communications between the school personnel designated to administer the drugs and the child's treating/prescribing psychiatrist. The IDEA does not intend to address claims such as these, even had the ALJ concluded that the administration of medication inferentially was provided for as a "related service" in A.A.'s IEP. The dispute in this case involves a medical treatment issue, not a special education one. As a result, the controversy resides outside of the expertise and training of an ALJ who adjudicates disputes regarding the IDEA. Allowing parties to use the IDEA as the mechanism for trying such disputes would open the doors to lawsuits

under the IDEA for a multitude of matters unrelated to the proper scope of special education.

The HCPS, under normal circumstances, has not refused to administer A.A.'s medication. It only refused to do so in the absence of the ability to consult directly and freely with A.A.'s treating/prescribing psychiatrist where the school nursing staff observed what they believed were potentially harmful side effects of the medications or contraindications to the continued administration of the drugs. Had the HCPS refused flatly to administer the medications under any circumstances, and A.A. needed the medications to benefit from her special education, subject matter jurisdiction over such a dispute likely would exist. When the issue, as here, however, deals principally with medical and ethical concerns, rather than those touching on special education, the IDEA provides no jurisdiction to resolve disputes through the due process complaint process.

Appellee's position reflects its concern about potential liability if it administers blindly drugs to students without the ability to contact physicians regarding withholding the drugs if circumstances suggest it prudent to do so. The school nurse arguably sees A.A. as or more frequently than Dr. Eist and, therefore, also may have a valid opinion as to the matter of the administration of A.A.'s medications. Unlike Dr. Eist, the nurse's assessments, with the added input of classroom observations from concerned teachers, are "based on daily and continuing observation within the classroom environment." *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1292 (5th Cir.1991). Based on the nurse's observations and the school system's arguably valid liability concerns, the HCPS decided that, in the face of the parents' concerns and demands, a more reasonable option, which would still allow A.A. to receive her FAPE, would be to have A.A.'s parents administer her medications during the school day, according to Dr. Eist's orders. *See generally Davis v. Francis Howell Sch. Dist.*, 138 F.3d 754, 757 (8th Cir.1998) (holding, in a complaint based on alleged violations of the Americans with Disabilities Act, the Rehabilitation Act, and 20 U.S.C. § 1983, that a

school district's "offer to allow the [parents] . . . to give [the child] his Ritalin during the school day is a reasonable accommodation as a matter of law" because questions of liability could impose a large burden on the school system). These issues raise questions of what constitutes reasonable medical practice, not the provision of "related services" to a child receiving special education.

 Were we to adopt the logic of the parents' interpretation of the IDEA that a matter relating, however tangentially, to any related service may become the proper basis for an IDEA claim, then administrative proceedings before ALJs may become prolific precursors or parallel proceedings to wrongful death or other tort actions resulting from the improper administration of medication as a related service. Clearly, the IDEA was not meant to provide a forum for the advancement of such claims. *See, e.g., Hunter v. Bd. of Educ.,* 292 Md. 481, 484, 439 A.2d 582, 584 (1982) ("[D]ecisions generally hold that a cause of action seeking damages for acts of negligence in the educational process is precluded by considerations of public policy, among them being the absence of a workable rule of care against which the defendant's conduct may be measured . . . and the extreme burden which would be imposed on the already strained resources of the public school system"); *Tabor v. Baltimore City Pub. Sch.,* 138 Md.App. 747, 751, 773 A.2d 628, 630 (2001) ("Maryland does not recognize a tort action seeking damages based on negligent education."); *Sellers,* 141 F.3d at 527 (holding that "the purpose of these procedural [due-process] mechanisms is to preserve the right to a free appropriate public education, not to provide a forum for tort-like claims of educational malpractice"); *Brown v. Houston Sch. Dist.,* 704 So.2d 1325, 1328 (Miss.1997) (holding no valid IDEA claim for failure to meet a child's educational needs where a special education student, who was sent to the principal's office for misbehaving, escaped the office, ran outside, and was subsequently found dead nearby the school); *Ortega v. Bibb County Sch. Dist.,* 397 F.3d 1321, 1325–26 (11th Cir.2005) (cataloguing U.S. Courts of Appeals' agreement on this general principle). In tort-sounding cases,

the connection to special education would be too attenuated to support a due process claim under the IDEA. Thus, we decline to adopt such a broad reading of the IDEA and its Maryland counterpart as would facilitate such tort-fraught claims being brought under these statutes. The dispute in this case does not touch truly on the provision of the administration of medications as a "related service," but is instead about an ethical issue, the need for school nurses to consult directly with prescribing physicians, which is associated only tangentially with a "related service."

The parents argue that the HCPS's position infringes upon their right to privacy and their fundamental right and liberty interest in the care, custody, and control of their child, relying on *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), *In re Yve S.*, 373 Md. 551, 819 A.2d 1030 (2003), and *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 642 A.2d 201 (1994).[25] It is telling that none of the parental autonomy issues addressed in those cases are cognizable as causes of action under the IDEA. The parents also urged that their dispute implicates other issues, such as the doctor-patient privilege and the relative role of doctor vís-a-vís nurse. Congress never intended that these issues would be resolved under the auspices of the IDEA.

Finally, A.A.'s parents contend that the ALJ ignored additional facts that they sought, and were prepared, to introduce at the hearing through expert and lay witnesses. For example, the parents claim that, at the hearing, they were prepared to disprove the factual predicate underlying the HCPS's demand for direct communication with Dr. Eist, namely to prove that A.A.'s symptoms of lethargy were not caused by the medication and that, even if they were, did not merit an interruption in her medication regime. These facts, even viewed in a light most favorable to the parents, simply bolster

---

**25.** The parents argued, at all stages of this litigation, that the HCPS violated "the constitutionally protected rights of the [parents] to make all decisions affecting the welfare of their daughter" and the "constitutional privacy rights of [the] family."

our view that this dispute falls outside the scope of the IDEA as a medical treatment issue, and not a special education issue.

## C.

### *Other Avenues of Relief*

As the ALJ suggested in this case, "redress is available in other forums in disputes of this nature, however, an administrative special education due process hearing is not the appropriate forum in which to resolve such an issue." Although the parents cannot proceed under the IDEA, other avenues of resolution may be available to them and others similarly situated. In *Davis v. Francis Howell School District*, a school that had been providing medication to a disabled child, eventually stopped providing the medication when the dosages became higher than the recommended amount. 104 F.3d 204, 205 (8th Cir.1997). The parents filed claims for injunctive relief under the ADA,[26] the Rehabilitation Act of 1973, § 504,[27] and § 1983,[28,29] and were unsuccessful because they failed to show a likelihood of success on the merits. *Id.* While we offer no opinion as to whether A.A.'s parents may fare any better

---

26. 42 U.S.C. §§ 12101 to 12213 (2000).

27. 29 U.S.C. §§ 701 to 794 (2000).

28. 42 U.S.C. § 1983 (2000).

29. Suggesting the potential for a valid claim under § 1983, the parents' brief cites to three cases which describe a parents' fundamental rights to control the manner in which their children are raised. *See Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (holding that the right "to direct the upbringing and education of children under their control" and the liberty interests of parents in the care, custody, and control of their children are protected by the 14th Amendment's Due Process Clause); *In re Yve S.*, 373 Md. 551, 565, 819 A.2d 1030, 1038 (2003) ("Certain fundamental rights are protected under the U.S. Constitution, and among those rights are a parent's 14th Amendment liberty interest in raising his or her children as he or she sees fit, without undue interference by the State."); *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201, 208 (1994) ("[T]he right of a parent to raise his or her child, ... recognized by constitutional principles, common law, and statute, is so fundamental that it may not be taken away unless clearly justified.").

than the parents in *Davis,* the causes of action pursued in that case conceptually are more appropriate avenues for relief than the IDEA. In fact, A.A.'s parents pled these causes of action in the Circuit Court, which dismissed them, without prejudice, because they were original claims brought incorrectly in conjunction with the petition for judicial review.[30]

## IV.

### *Conclusion*

We affirm the decision of the ALJ dismissing the parents' complaint for lack of subject matter jurisdiction under the IDEA and its Maryland counterpart. In doing so, we hold first that it is not necessary for the related service to be included in the IEP to form the basis on which parents may bring a due process complaint. When, as here, however, the disputed question is a medical or ethical one, and not a special education issue, an ALJ has the power under the IDEA and related Maryland law to dismiss the complaint for lack of subject matter jurisdiction as falling outside his or her power to decide matters "relating to the identification, evaluation, or placement of a disabled child, or the provision of free appropriate public education to such child." The ALJ did not err here in dismissing Appellants' complaint for lack of subject matter jurisdiction.

JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.

---

**30.** *See supra* note 21.